**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

_____

| | | |
|---|---|---|
| SCOTT WHITELEY and HARRY BERGER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 2:19-cv-04959-NIQA |
| Plaintiffs, | ) ) ) | **ORAL ARGUMENT REQUESTED** |
| v. | ) ) | |
| ZYNERBA PHARMACEUTICALS, INC., ARMANDO ANIDO, and JAMES E. FICKENSCHER, | ) ) ) ) | |
| Defendants. | ) ) | |

_____

**MEMORANDUM IN SUPPORT OF DEFENDANTS'**
**MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ......................................................................................................... 1

FACTUAL BACKGROUND ........................................................................................ 3

      A.    Introduction To Zynerba And Zygel.......................................... 3

      B.    Clinical Trials And The FDA Approval Process ...................... 5

      C.    The BELIEVE 1 Phase 2 Clinical Trial For Use Of Zygel To Treat DEE.......................................................................................... 6

      D.    Zynerba Repeatedly Warned Investors Of The Risks That Its Clinical Trials Might Not Be Successful And That It Might Not Receive Regulatory Approval To Market Zygel ....................... 9

      E.    Zynerba Discloses Results Of The BELIEVE 1 Trial ............. 11

ARGUMENT ............................................................................................................... 13

    I.    PLAINTIFFS' SECURITIES FRAUD CLAIMS ARE SUBJECT TO HEIGHTENED PLEADING REQUIREMENTS. ................................ 13

    II.    PLAINTIFFS FAIL TO ALLEGE SCIENTER. .................................. 16

      A.    Plaintiffs Fail To Allege Motive And Opportunity To Commit Fraud. ...................................................................................... 16

      B.    Plaintiffs Fail To Allege Strong Circumstantial Allegations Of Intent To Defraud..................................................................... 19

      C.    Any Inference Of Scienter Is Neither Compelling Nor As Strong As Non-Fraudulent Inference. ................................................ 23

      D.    Plaintiffs Cannot Rely On Group Pleading To Establish Scienter. ......... 25

    III.    PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION. ................................................... 26

      A.    Silence, Absent A Duty To Disclose, Is Not Actionable......... 26

      B.    Corporate Optimism And Puffery Is Not Actionable. ............. 30

      C.    Defendants' Statements Are Protected By The PSLRA's Safe Harbor Provision................................................................... 32

    IV.    PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY. ............... 33

CONCLUSION ............................................................................................................ 35

# TABLE OF AUTHORITIES

### CASES

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009)................................................................................13, 14

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).....................................................................................26

*Bauer v. Eagle Pharma. Inc.*,
  No. 16-3091 (JLL), 2017 WL 2213147 (D.N.J. May 19, 2017)............................30

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)......................................................................................14

*Buck v. Hampton Twp. Sch. Dist.*,
  452 F.3d 256 (3d Cir. 2006)...............................................................................4

*City of Edinburgh Council v. Pfizer, Inc.*,
  754 F.3d 159 (3d Cir. 2014)........................................................................13, 14

*Fowler v. UPMC Shadyside*,
  578 F.3d 203 (3d Cir. 2009)......................................................................... 13-14

*Galestan v. OneMain Holdings, Inc.*,
  348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) .........................................................31

*GSC Partners CDO Fund v. Washington*,
  368 F.3d 228 (3d Cir. 2004)................................................................15, 16, 19

*Hirtenstein v. Cempra, Inc.*,
  348 F. Supp. 3d 530 (M.D.N.C. 2018) ...............................................................31

*Huang v. Avalanche Biotechnologies, Inc.*,
  No. 15-CV-03185-JD, 2016 WL 6524401 (N.D. Cal. Nov. 3, 2016)....................27

*In re Adolor Corp.Sec. Litig.*,
  616 F. Supp. 2d 551 (E.D. Pa. 2009) .............................................................26, 27

*In re Advanta Corp. Sec. Litig.*,
  180 F.3d 525 (3d Cir. 1999)........................................................................17, 20

*In re Aetna, Inc. Sec. Litig.*,
  617 F.3d 272 (3d Cir. 2010)........................................................................30, 32

*In re Amarin Corp. PLC Sec. Litig.*,
  689 F. App'x 124 (3d Cir. 2017) .......................................................................30

*In re AstraZeneca Sec. Litig.*,
  559 F. Supp. 2d 453 (S.D.N.Y. 2008)..................................................................................25

*In re Bayer AG Sec. Litig.*,
  No. 03 CIV.1546 WHP, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004)................................19

*In re Bofi Holding, Inc. Sec. Litig.*,
  No. 15-2324-GPC, 2016 WL 5390533 (S.D. Cal. Sept, 27, 2016).........................................21

*In re Burlington Coat Factory Sec. Litig.*,
  114 F.3d 1410 (3d Cir. 1997)...................................................................................14, 16, 17, 26

*In re Columbia Labs., Inc. Sec. Litig.*,
  602 F. App'x 80 (3d Cir. 2015) ............................................................................................24

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
  7 F.3d 357 (3d Cir. 1993)......................................................................................................28

*In re Egalet Corp. Sec. Litig.*,
  340 F. Supp. 3d 479 (E.D. Pa. 2018) ...............................................................................18, 32

*In re Hertz Glob. Holdings, Inc.*,
  905 F.3d 106 (3d Cir. 2018)...................................................................................................16

*In re Human Genome Scis. Inc. Sec. Litig.*,
  933 F. Supp. 2d 751 (D. Md. 2013)........................................................................................23

*In re Intelligroup Sec. Litig.*,
  468 F. Supp. 2d 670 (D.N.J. 2006) ..........................................................................................4

*In re Merck & Co., Inc. Sec. Litig.*,
  432 F.3d 261 (3d Cir. 2005)...................................................................................................33

*In re NAHC, Inc. Sec. Litig.*,
  306 F.3d 1314 (3d Cir. 2002)....................................................................................................4

*In re PDI Sec. Litig.*,
  No. 02-211 (GEB), 2006 WL 3350461 (D.N.J. Nov. 16, 2006)............................................19

*In re Radian Sec. Litig.*,
  612 F. Supp. 2d 594 (E.D. Pa. 2009) ....................................................................................20

*In re Rigel Pharm., Inc. Sec. Litig.*,
  697 F.3d 869 (9th Cir. 2012) .................................................................................................17

*In re Rockefeller Ctr. Props., Inc. Sec. Litig.*,
  311 F.3d 198 (3d Cir. 2002)...................................................................................................14

*In re Sanofi Sec. Litig.*,
   87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015), *aff'd sub nom. Tongue v. Sanofi*,
   816 F.3d 199 (2d Cir. 2016)............................................................................ passim

*Institutional Inv'rs Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)............................................................................ passim

*Key Equity Inv'rs Inc. v. Sel-Leb Mktg. Inc.*,
   246 F. App'x 780 (3d Cir. 2007) .............................................................................18

*Klein v. Autek Corp.*,
   147 F. App'x 270 (3d Cir. 2005) .............................................................................18

*Koncelik v. Savient Pharm., Inc.*,
   No. 08 CIV. 10262 (GBD), 2010 WL 3910307 (S.D.N.Y. Sept. 29, 2010),
   *aff'd*, 448 F. App'x 154 (2d Cir. 2012)...................................................................22

*Leder v. Shinfeld*,
   No. 06-CV-1805, 2008 WL 2165097 (E.D. Pa. May 22, 2008)...............................19

*Liu v. Intercept Pharm., Inc.*,
   No. 17-cv-7371 (LAK), 2020 WL 1489831 (S.D.N.Y. Mar. 26, 2020)...................22

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011)....................................................................................................28

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
   720 F. Supp. 2d 517 (D.N.J. 2010) .........................................................................17

*Nguyen v. New Link Genetics Corp.*,
   297 F. Supp. 3d 472 (S.D.N.Y. 2018).....................................................................31

*Oran v. Stafford*,
   226 F.3d 275 (3d Cr. 2000)......................................................................... passim

*Phillips v. Cty. of Allegheny*,
   515 F.3d 224 (3d Cir. 2008).....................................................................................14

*Sapir v. Averback*,
   No. 14-7331 (JLL), 2016 WL 554581 (D.N.J. Feb. 10, 2016)...............................21

*Schmidt v. Skolas*,
   770 F.3d 241 (3d Cir. 2014)........................................................................................4

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................15, 22, 23

iv

*Turner v. MagicJack VocalTec, Ltd.*,
    No. 13-0448, 2014 WL 406917 (S.D.N.Y. Feb. 3, 2014).......................................................17

*Winer Family Tr. v. Queen*,
    503 F.3d 319 (3d Cir. 2007)...................................................................................15, 23, 25

**STATUTES**

15 U.S.C. § 78t.........................................................................................................................33

15 U.S.C. § 78u-4 ............................................................................................................ passim

15 U.S.C. § 78u–5.............................................................................................................15, 32

Securities Exchange Act of 1934,
    § 10(b) ............................................................................................................... passim
    § 20(a) ......................................................................................................................13, 33

**OTHER AUTHORITIES**

21 C.F.R. § 312.32 ...................................................................................................................12

Fed. R. Civ. P. 9(b) ...........................................................................................................1, 2, 14

Fed. R. Civ. P. 12(b)(6)......................................................................................................1, 13, 14

Defendants Armando Anido and James E. Fickenscher ("Individual Defendants") and Zynerba Pharmaceuticals, Inc. ("Zynerba" or the "Company") (collectively, "Defendants") submit this Memorandum of Law in Support of their Motion to Dismiss the Amended Class Action Complaint ("Amended Complaint") pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## INTRODUCTION

Zynerba is a clinical stage pharmaceutical company. Zynerba does not currently have any marketed products and Zygel, a cannabidiol gel, is its only product candidate under development. Zynerba cannot market Zygel in the United States unless and until clinical trials sufficiently demonstrate both its safety and efficacy and the FDA has granted Zynerba approval to market the product. Zynerba completed initial Phase 1 clinical trials for Zygel in 2016. Zynerba has conducted and is continuing today to conduct Phase 2 clinical trials for Zygel for several different rare and near rare neuropsychiatric disorders. This case involves a single Phase 2 clinical trial that was designed to investigate whether Zygel is a safe and effective treatment for a group of ultra-rare, severe child-onset epilepsies known as developmental and epileptic encephalopathies ("DEE"). Top-line results from this clinical trial—referred to as the BELIEVE 1 trial—suggest that Zygel may reduce seizures and provide other benefits to patients. The safety data—which was consistent with previously disclosed safety data from other Zygel clinical trials—show that Zygel was generally well tolerated, with the vast majority of adverse events relating to either skin dryness/pain or sleepiness. Accordingly, based on the BELIEVE 1 trial results and other clinical studies, Zynerba is continuing down the clinical pathway to seek FDA approval of Zygel for the treatment of DEE.

Despite the positive results of the BELIEVE 1 trial, Plaintiffs Scott Whiteley and Harry Berger ("Plaintiffs") claim that Defendants committed securities fraud. Specifically, Plaintiffs

allege that Defendants should have disclosed adverse events that occurred during the BELIEVE 1 trial even *before* the trial was completed and *before* the full results could be summarized and analyzed. Thus, even though Zynerba *repeatedly* told the market that it would disclose the trial results once the BELIEVE 1 trial was completed in the third quarter of 2019 and Zynerba's standard practice has always been to disclose results only upon completion of a clinical trial, Plaintiffs claim that Defendants should have disclosed the adverse events from this one particular trial earlier. Plaintiffs are wrong.

As a threshold matter, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) and the PSLRA require Plaintiffs to allege particularized facts showing that Defendants acted with scienter, *i.e.*, an intent to defraud investors. Plaintiffs fail entirely to do so. Instead, they allege generic motivations common to all companies and executives—such as the desire to raise capital—from which no fraudulent intent can be inferred as a matter of law.

Unable to identify any motive to defraud investors, Plaintiffs must plead circumstantial evidence of fraud that supports a strong inference of scienter. Once again, Plaintiffs fail. Instead of pleading specific facts, they contend that the Individual Defendants knew of the adverse events observed during the BELIEVE 1 trial based solely on their job titles and the fact that they signed SEC filings—arguments courts routinely reject. Plaintiffs also attempt to plead scienter by alleging, in a wholly conclusory fashion, that the Individual Defendants knew about the adverse events based on general information about FDA reporting requirements. But Plaintiffs do not support their conclusion with any particularized facts, such as facts showing that the Individual Defendants' were involved with the BELIEVE 1 trial, when the adverse events arose, when the Individual Defendants allegedly learned about them, and whether the adverse events even occurred before the alleged misstatements were made. Nor do Plaintiffs allege facts showing that it was

more likely that the Defendants intended to defraud the public than that the Individual Defendants either did not know of the adverse events in real time or that Defendants simply chose not to disclose preliminary and incomplete data prior to the completion of the BELIEVE 1 trial. The strict pleading standards of the PSLRA demand far more.

In addition to scienter, the heightened pleading requirements require Plaintiffs to allege an actionable misstatement or omission. Plaintiffs unsuccessfully attempt to meet this requirement by alleging that Defendants fraudulently failed to disclose the adverse events before the end of the BELIEVE 1 trial. However, even if the Individual Defendants knew about the adverse events while the trial was ongoing (which Plaintiffs have not sufficiently pleaded), Defendants had no duty to disclose this information sooner than they did. No statute or regulation mandated disclosure to investors before the completion of the trial. Nor did any public statement made by Zynerba create a duty for the Company to disclose the adverse events prior to the trial's conclusion. Thus, Plaintiffs fail to allege an actionable material misstatement or omission.

For each of these reasons, and those discussed below, Plaintiffs' attempt to state a securities claim fails as a matter of law. The Amended Complaint should therefore be dismissed with prejudice.

## FACTUAL BACKGROUND

### A.   Introduction To Zynerba And Zygel

Zynerba is plainly a risky investment. Zynerba is a clinical-stage specialty pharmaceutical company. Am. Compl. ¶¶ 2, 13. It does not currently market any products and only has a single product candidate—Zygel—under development. Am. Compl. ¶¶ 2-3. Zygel is still in the clinical stage of development, has not yet received FDA approval, and may never be commercialized. Am.

3

Compl. ¶¶ 2, 3, 19; Ex. A, 2018 Form 10-K at 5.[1]  As Zynerba has repeatedly disclosed to its investors, Zynerba "has incurred losses and negative cash flows from operations since inception" and "anticipates incurring additional losses until such time, if ever, that it can generate significant revenue from its product candidates currently in development."  Am. Compl. ¶ 20; Ex. A, 2018 Form 10-K at 96; Ex. B, 2019 Q1 Form 10-Q at 8.  Indeed, Zynerba's 2017 and 2018 operating revenues totaled only $86,000, while its operating expenses exceeded $72 *million*. Ex. A, 2018 Form 10-K at 93.  Given the uncertain nature of its business, Zynerba has expressly warned investors time and again that if Zygel "fail[s] in clinical trials or do[es] not gain regulatory approval, or even if approved, fails to achieve market acceptance, we may never become profitable." *Id.* at 40.

Zygel is a pharmaceutically-produced cannabidiol, or CBD, gel.  Am. Comp. ¶¶ 3, 19; Ex. C, June 2019 Presentation at 5; Ex. A, 2018 Form 10-K at 5.  Zygel is applied transdermally and its formulation is designed to deliver CBD through the skin into the circulatory system.  Ex. A, 2018 Form 10-K at 5; Ex. D, Aug. 6, 2019 Form 8-K, Presentation at 5.  Early preclinical and clinical studies have shown that Zygel may have potential utility in treating various severe, chronic health conditions, including Fragile X syndrome ("FXS"), Autism Spectrum Disorder ("ASD"), 22q11.2 Deletion Syndrome ("22q"), and DEE.  Am. Compl. ¶ 3; Ex. A, 2018 Form 10-K at 5.[2]

---

[1]  All exhibits referenced herein are attached to the Declaration of Michael S. Doluisio, dated April 23, 2020, and filed concurrently herewith.

[2]  The Court can take judicial notice of the documents cited herein.  First, documents filed with the SEC are properly considered on a motion to dismiss. *Buck v. Hampton Twp. Sch. Dist.*, 452 F.3d 256, 260 (3d Cir. 2006); *Schmidt v. Skolas*, 770 F.3d 241, 249 (3d Cir. 2014); *see also In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002).  Second, a court may properly take judicial notice of documents on which a complaint relies. *Buck*, 452 F.3d at 260; *Schmidt*, 770 F.3d at 249; *see also NAHC*, 306 F.3d at 1331.  Third, when a plaintiff relies upon only select portions of a document, the Court may review the *entire* document. *In re Intelligroup Sec. Litig.*, 468 F. Supp. 2d 670, 679 (D.N.J. 2006); *see also NAHC*, 306 F.3d at 1331.

DEE is a set of severe, devastating brain disorders that manifest with seizures, behavioral disturbances, or abnormalities in electrical activity in the brain that can cause or worsen cognitive impairment, psychiatric problems, and behavioral disturbances.  Am. Compl. ¶ 19; Ex. A, 2018 Form 10-K at 13; Ex. D, Aug. 6, 2019 Form 8-K, Presentation at 18.  These disorders are often progressive and are highly resistant to treatment.  Am. Compl. ¶ 19; Ex. D, Aug. 6, 2019, Form 8-K, Presentation at 18.

### B.    Clinical Trials And The FDA Approval Process

Zynerba must receive FDA approval before marketing and selling Zygel in the United States.  Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 20, 47.  As Zynerba has explained to investors, obtaining FDA approval of a potential drug candidate is a "lengthy, complex, and expensive" process, and "the outcome is far from certain."  Ex. A, 2018 Form 10-K at 20, 47.  Prior to approval, the FDA requires drug candidates to undergo clinical trials that are subject to strict FDA requirements.  Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 20.  Among other things, the FDA may suspend a clinical trial at any time on various grounds, including if the FDA determines that participants or patients are being exposed to an unacceptable health risk.  *Id* at 22.  Relevant here, the FDA has ***never*** suspended any clinical trial evaluating Zygel.

There are typically three phases of clinical trials.  Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 20.

- Phase 1 clinical trials involve only a small number of human subjects, and the primary purpose is "to evaluate the safety, metabolism, [absorption] and pharmacologic actions of the product candidate in humans, the side effects associated with increasing doses, and if possible, to gain early evidence on effectiveness."  Am. Compl. ¶ 21; Ex. A, 2018n Form 10-K at 21.

- If Phase 1 trials go well, the sponsor may proceed to Phase 2 clinical trials, which involve a limited patient population and "are conducted to develop initial data regarding the effectiveness of the product candidate in the target disease or condition, to determine dosage tolerance and optimal dosage, and to identify possible adverse side effects and additional safety risks associated with the product candidate." Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 22.

- Finally, if Phase 2 clinical trials suggest the candidate product may be effective, only then may the sponsor proceed with Phase 3 clinical trials to further evaluate the drug. Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 22. Phase 3 clinical trials are conducted in an expanded subject population at geographically dispersed clinical trial sites and "are intended to further evaluate dosage, clinical effectiveness and safety, to establish the overall benefit-risk profile of the product candidate, and to provide an adequate basis for labeling." Am. Compl. ¶ 21; Ex. A, 2018 Form 10-K at 22.

Upon completion of Phase 3 clinical trials, a sponsor assembles the data from all clinical trials, preclinical studies, and product development, along with descriptions of the manufacturing process, proposed labeling, and other information, and submits it to the FDA in a New Drug Application. Ex. A, 2018 Form 10-K at 22. The FDA typically requires at least two adequate and well-controlled Phase 3 clinical trials prior to approving a new drug. *Id.* at 22.

C.      **The BELIEVE 1 Phase 2 Clinical Trial For Use Of Zygel To Treat DEE**

Since 2015, Zynerba has evaluated Zygel in a number of different clinical studies involving hundreds of patients for the treatment of several different health conditions, including FXS, Autism, 22q, and DEE, as well as adult epilepsy and osteoarthritis. *Id.* at 5-7; Ex. B, 2019 Q1

Form 10-Q at 16-18; Ex. C, June 2019 Presentation at 4; Ex. F, 2019 Q2 Form 10-Q at 17-19. Initial Phase 1 clinical trials for Zygel were completed in 2016. Ex. A, 2018 Form 10-K at 16-17.

In 2017, the Company completed and announced top-line results from two Phase 2 clinical trials for the use of Zygel to treat adult epilepsy patients with focal seizures, as well as patients suffering from osteoarthritis. Zynerba, Press Release, Zynerba Pharmaceuticals Announces Top-Line Results for Phase 2 STAR 1 Trial of ZYN02 in Adult Epilepsy Patients with Focal Seizures (Aug. 7, 2017) (Ex. G); Zynerba, Press Release, Zynerba Pharmaceuticals Announces that Results from Phase 2 STOP Trial Support Continued Development of ZYN002[3] in Osteoarthritis (Aug. 14, 2017) (Ex. H). Nearly 500 patients participated in those two Phase 2 trials. Ex. G, Aug. 7, 2017 Press Release (188 patients participated in adult epilepsy trial); Ex. H, Aug. 14, 2017 Press Release (320 patients participated in osteoarthritis trial). In August 2017, upon completion of those trials, Zynerba publicly announced the safety data, as well as the efficacy results, from those trials. Ex. G, Aug. 7, 2017 Press Release; Ex. H, Aug. 14, 2017 Press Release.

In addition, before and during the putative Class Period (March 11, 2019 through September 17, 2019, Am. Compl. ¶ 1), the Company conducted multiple Phase 2 clinical trials for Zygel for the treatment of FXS, ASD, 22q, and DEE. Ex. A, 2018 Form 10-K at 5-7; Ex. D, Aug. 6, 2019 Form 8-K, Presentation at 4. Plaintiffs' Amended Complaint, however, relates to just one such Phase 2 clinical trial, referred to as the BELIEVE 1 trial. *See, e.g.*, Am. Compl. ¶¶ 3-5, 23-25.

The BELIEVE 1 trial was a Phase 2 clinical trial evaluating Zygel for the treatment of DEE. Zynerba initiated the BELIEVE 1 trial in April 2018 in Australia and New Zealand as a six-month-long, open-label multi-dose clinical trial designed to evaluate the efficacy and safety of

---

[3]    Prior to February 2019, Zygel was referred to as "ZYN002." Ex. A, 2018 Form 10-K at 5.

Zygel in children and adolescents (ages 3 to 17 years old) with DEE. Am. Compl. ¶ 23; Ex. I, Apr. 10, 2018 Press Release; Ex. A, 2018 Form 10-K at 13; Ex. D, Aug. 6, 2019, Form 8-K, Presentation at 19. The primary efficacy endpoint of this extended trial was a change in seizure frequency from baseline. Ex. A, 2018 Form 10-K at 13. Enrollment in the BELIEVE 1 trial was completed in December 2018. *Id.*

The enrollment criteria for the BELIEVE 1 trial resulted in medically fragile patients participating in the trial. Ex. E, 2019 Form 10-K at 15; Ex. J, Apr. 15 2020 Form 8-K, Presentation at 33; Ex. I, Apr. 10, 2018 Press Release. To be included in the study, patients were required to have at least 5 generalized motor seizures during the baseline period of four weeks. Approximately 27% of participants in the study had either Dravet syndrome (a catastrophic type of childhood epilepsy with prolonged seizures often triggered by hot temperatures or fever) or Lennox-Gastaut Syndrome (a severe form of childhood epilepsy involving multiple types of seizures). Ex. I, Apr. 10, 2018 Press Release; Ex. A, 2018 Form 10-K at 13; Ex. D, Aug. 6, 2019 Form 8-K, Presentation at 18. Many children with DEE suffer from multiple other comorbidities including cerebral palsy, chronic respiratory infections, gait disturbances, movement disorders, scoliosis, and feeding problems. Ex. J, Apr.15, 2020, Form 8-K, Presentation at 33. Many children with DEE are wheelchair-bound and have feeding tubes. *Id.*

Throughout 2018 and 2019, Zynerba publicly announced the timeline for the BELIEVE 1 trial, as well as the dates upon which enrollment and initial dosing were completed. *See, e.g.*, Ex. I, Apr. 10, 2018 Press Release; Ex. A, 2018 Form 10-K at 13; Ex. C, June 2019 Presentation at 19; Ex. B, 2019 Q1 Form 10-Q at 16; Ex. D, Aug. 6, 2019 Form 8-K, Presentation at 19. In each announcement, Zynerba made clear that that *it did not plan to release data* about the safety or

8

efficacy from the BELIEVE 1 trial *until the third quarter of 2019*, after completing the trial.[4]  At no time prior to the third quarter of 2019 did Zynerba disclose any safety or efficacy data from the BELIEVE 1 trial.  This was consistent with Zynerba's standard practice of waiting until after the completion of a clinical trial to disclose efficacy and safety results.[5]

> **D.    Zynerba Repeatedly Warned Investors Of The Risks That Its Clinical Trials Might Not Be Successful And That It Might Not Receive Regulatory Approval To Market Zygel**

Before and throughout the putative Class Period, Zynerba issued warnings to investors about the many inherent risks associated with investing in a clinical stage pharmaceutical company without a current marketed product and with only a single product candidate under development, including that Zygel may fail in clinical trials or may not ultimately gain regulatory approval for a particular indication or at all.  *See, e.g.*, Am. Compl. ¶ 31; Ex. A, 2018 Form 10-K at 40-73; Ex. C, June 2019 Presentation at 2.  These warnings were repeated, extensive, specific, and tailored to Zynerba's unique circumstances.  For example, Zynerba disclosed that it currently "ha[s] no

---

[4]    *See, e.g.*, Ex. I, Apr. 10, 2018 Press Release ("The Company expects to report topline results in 2019."); Ex. A, 2018 Form 10-K at 13 ("We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019."); Ex. B, 2019 Q1 Form 10-Q at 17 ("We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019."); Ex. C, June 2019 Presentation at 19 ("Top line results expected in 3Q2019."); *id.* at 20 ("Enrollment complete / Dosing continues / Six Months: ONGOING"); Ex. D, Aug. 6, 2019, Form 8-K, Presentation at 19 ("Top line results in September 2019."); *id.* at 20 ("Enrollment complete / Dosing continues / Six Months: ONGOING"); Ex. K, Aug. 30, 2019 Prospectus Supplement at S-3 (We expect to report top line results from the BELIEVE 1 trial in September of 2019.").

[5]    *See, e.g.*, Ex. G, Aug. 7, 2017 Press Release (announcing top-line results from adult epilepsy Phase 2 clinical trial following completion of trial); Ex. L, 2017 Form 10-K at 10 (stating top-line results for the Phase 2 clinical trial designed to evaluate the efficacy and safety of Zygel for the treatment of knee pain due to osteoarthritis would be announced after completion of trial in July/August 2017); Ex. H Aug. 14, 2017 Press Release (announcing top-line results from osteoarthritis clinical trial following completion of trial); Ex. E, 2019 Form 10-K at 15 (stating top-line results of Phase 2 clinical trial for Zygel's treatment of children with ASD would be reported in second quarter of 2020 following completion of trial).

9

marketed products," has "incurred significant losses since [its] inception and anticipate[s] that [it] will continue to incur losses in the future," and "currently ha[s] no commercial revenue." Ex. A, 2018 Form 10-K at 40, 44. In its public disclosures to investors, the Company explained that Zygel was still in Phase 2 clinical development and clearly warned that if it fails "in clinical trials or do[es] not gain regulatory approval, or even if approved, fails to achieve market acceptance, we may never become profitable." *Id.* at 40, 44. Zynerba further cautioned that "[o]ur business depends almost entirely on the successful clinical development, regulatory approval and commercialization of our product candidates, and substantial additional clinical development and regulatory approval efforts will be required before we are permitted to commence commercialization, if ever." *Id.* at 44.

Moreover, Zynerba specifically warned investors about risks attributable to early stage development and clearly cautioned investors that the promising results of preclinical studies and earlier Phase 1 and 2 clinical trials for Zygel "are not necessarily predictive of future results," including for "ongoing clinical trials for Zygel in patients with FXS, DEE, ASD, and our planned clinical trial in 22q." *Id.* at 45. Zynerba also cautioned that its "interpretation of clinical data or our conclusions based on preclinical . . . models may prove inaccurate." *Id.* The Company explained that "[m]any companies in the pharmaceutical and biotechnology industries have suffered significant setbacks in clinical trials after achieving positive results in preclinical and early clinical development, and we cannot be certain that we will not face similar setbacks." *Id.* Zynerba specifically called out "safety or efficacy observations in clinical trials, including adverse events," as setbacks that could adversely affect its business and financial prospects. *Id.*

Finally, in its warnings to investors, Zynerba emphasized external factors associated with the regulatory approval process that may impact the Company's success and cautioned that Zygel

10

may never obtain FDA approval and thus might never be commercialized.  *Id.* at 47.  It warned that the FDA's approval process is "lengthy, time-consuming and inherently unpredictable."  *Id.* In particular, Zynerba advised investors that the FDA and other regulators may "delay, limit or deny approval of [Zygel] for many reasons," including because "we may not be able to demonstrate that our product candidates are safe . . . ."  *Id.*  Given that Zygel is its sole product under development, Zynerba stated that any "setback with regard to Zygel in our pursuit of regulatory approval, in any of our planned indications, could have a material adverse effect on our business and prospects."  *Id.* at 48.  In sum, the Company cautioned that if Zynerba is "ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed." *Id.* at 47.

### E.        Zynerba Discloses Results Of The BELIEVE 1 Trial

In line with its consistent public statements to investors and its standard practice of disclosing clinical trial results only upon completion of the trial, Zynerba announced in September 2019 the top-line data from the BELIEVE 1 trial, including top-line efficacy results and safety data.  Am. Compl. ¶ 13; Ex. M, Sept. 18, 2019 Press Release.  Zynerba announced that children enrolled in the study achieved 44% to 58% monthly reduction in seizures compared to baseline from month two to month six of treatment with Zygel, and that qualitative assessments by parents and caregivers in the study demonstrated that Zygel may also result in improved socio-behavioral and cognitive symptoms in children with DEE.  Ex. M, Sept. 18, 2019 Press Release.  With regard to safety data, Zynerba reported that Zygel was "well tolerated, and the safety profile was consistent with previously released data from Zygel clinical trials."  *Id.*  As was to be expected given the medically fragile patient population enrolled in the BELIEVE 1 trial and the extended length of the trial, Zynerba reported that, ***through six months of therapy***, 96% of BELIEVE 1 trial participants experienced a treatment emergent adverse event and 60% of patients experienced a

11

treatment related adverse event.[6]  *Id.*  Most of these events were "mild to moderate," with the most common events being application site dryness or pain and somnolence (sleepiness).  *Id.*  Ten patients did report serious adverse events; of these, only two—a lower respiratory tract infection and status epilepticus (a seizure lasting more than 5 minutes or multiple seizures close together in time)—were determined to be even "possibly related to treatment."  *Id.*

Overall, Zynerba categorized the top-line data as "positive."  *Id.*  Zynerba announced that "[t]he data from the BELIEVE 1 clinical trial are promising and suggest Zygel may reduce seizure frequency in many types of difficult to treat [DEE] and improve important behavior deficits, alertness, social interactions, and enable the child to be well enough to attend school more consistently."  *Id.*  Zynerba extended the open-label trial of Zygel for an additional six months. Ex. J, Apr.15, 2020 Form 8-K, Presentation at 34.  Based on the BELIEVE 1 trial results, Zynerba announced its plans to seek a meeting with the FDA in 2020 to discuss the clinical pathway to approval.  Ex. M, Sept. 18, 2019 Press Release at 1.  Zynerba is still pursuing the study and development of Zygel today, including for the treatment of DEE and other conditions, including in children and adolescents.[7]

---

[6]  The FDA defines "adverse events" to include "***any untoward*** medical occurrence associated with the use of a drug in humans, ***whether or not considered drug related***."  21 C.F.R. § 312.32(a). Thus, even minor symptoms, such as skin dryness and sleepiness, qualify as adverse events.  The FDA's own regulations provide that the adverse events that the FDA requires to be reported may be random and may not establish a nexus between a drug and the reported illness.  *See* 21 C.F.R. § 312.32(e) ("A safety report or other information submitted by a sponsor under this part (and any release by FDA of that report or information) does not necessarily reflect a conclusion by the sponsor or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse event.  A sponsor need not admit, and may deny, that the report or information submitted by the sponsor constitutes an admission that the drug caused or contributed to an adverse event.").

[7]  For instance, Zynerba currently has ongoing a double-blind, placebo-controlled trial with 212 enrolled patients to assess the efficacy and safety of Zygel in children and adolescents with FXS,

Ignoring the positive efficacy results and the overall conclusion from the BELIEVE 1 trial that Zygel is well-tolerated, Plaintiffs filed this lawsuit, alleging that Defendants violated Sections 10(b) and 20(a) of the Securities and Exchange Act and that the disclosure of the BELIEVE 1 adverse events caused Zynerba's stock price to fall. As discussed below, Plaintiffs' claims suffer from various fatal flaws that warrant the dismissal of the Amended Complaint with prejudice.

## ARGUMENT

To state a claim for securities fraud under Section 10(b), a plaintiff must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). Here, Plaintiffs have failed to plead either scienter or a material misrepresentation or omission, both of which are subject to heightened pleading standards. For those reasons, and as more fully explained below, the Amended Complaint should be dismissed in full.

## I.    PLAINTIFFS' SECURITIES FRAUD CLAIMS ARE SUBJECT TO HEIGHTENED PLEADING REQUIREMENTS.

The analysis of a securities fraud complaint begins with the familiar Rule 12(b)(6) standard: Although this Court must accept as true well-pleaded factual allegations, it need not accept "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, a complaint must "set out sufficient factual matter to show that the claim is facially plausible." *Fowler v. UPMC Shadyside*,

---

a genetic condition that causes a range of developmental problems including learning disabilities and cognitive impairment. Ex. E, 2019 Form 10-K at 81.

578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks omitted).  A plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  To survive a motion to dismiss under Rule 12(b)(6), "a plaintiff must nudge [his or her] claims across the line from conceivable to plausible." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008)  (quoting *Twombly*, 550 U.S. at 570).

Satisfying the typical *Twombly/Iqbal* standard, however, is not sufficient.  Rather, securities fraud plaintiffs must also satisfy Rule 9(b)'s stringent requirements for pleading allegations of fraud.  "Rule 9(b)'s heightened pleading standard gives defendants notice of the claims against them, provides an increased measure of protection for their reputations, and reduces the number of frivolous suits brought solely to extract settlements." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).   Under Rule 9(b), Plaintiffs must plead particularized facts, including "the who, what, when, where and how" of the events at issue. *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009).  Rule 9(b)'s particularity requirement is "rigorously applied in securities fraud cases," and "boilerplate and conclusory allegations will not suffice." *Burlington*, 114 F.3d at 1417-18.

Beyond the Rule 9(b) requirements, the PSLRA imposes even more stringent pleading burdens on plaintiffs. *See In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (the PSLRA "imposes another layer of factual particularity").  Under the PSLRA, Plaintiffs must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint state *with particularity* all facts on which that belief is formed."  15 U.S.C. § 78u-4(b)(1); *Edinburgh*, 754 F.3d at 166 (emphasis added).  The Third

14

Circuit "rigorously" applies these stringent pleading standards. *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 236 (3d Cir. 2004).

Additionally, the PSLRA requires Plaintiffs to "state with particularity facts giving rise to a strong inference" that Defendants acted with fraudulent intent. 15 U.S.C. § 78u–4(b)(2)(A); *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007). Section 78u-4(b)(2) of the PSLRA does not permit a plaintiff to generally allege a defendant's state of mind. *Avaya*, 564 F.3d at 253. Instead, the PSLRA imposes an "exacting pleading standard for scienter." *Id.* (internal quotation marks and alterations omitted). Under this standard, a plaintiff must allege facts that establish a strong inference that the defendant acted with scienter. *Tellabs*, 551 U.S. at 321.

To that end, the Supreme Court has recognized that "[t]he strength of an inference cannot be decided in a vacuum." *Id.* at 323. Courts "must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Id.* at 324. A complaint may survive dismissal only "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any plausible opposing inference one could draw from the facts alleged." *Id.* at 324; *Winer Family Tr. v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007). Where the challenged statements are forward-looking—including the likelihood of positive results in a clinical trial or the likelihood of FDA approval—the scienter requirement is even "stricter," requiring the plaintiff to plead that the defendants actually *knew* their statements were *false* when made. 15 U.S.C. § 78u–5(c)(1)(B)(i); *Avaya*, 564 F.3d at 274. If a complaint fails to comply with the PSLRA's pleading requirements, dismissal is mandatory. 15 U.S.C. § 78u–4(b)(3)(A); *GSC Partners*, 368 F.3d at 237.

15

Plaintiffs' Amended Complaint fails to satisfy these rigorous pleading standards.  The Amended Complaint should therefore be dismissed with prejudice.

## II.    PLAINTIFFS FAIL TO ALLEGE SCIENTER.

To bring a claim under Section 10(b) of the Exchange Act, a plaintiff must allege, with particularity, facts showing that the defendant acted with "scienter," *i.e.*, that the defendant consciously or recklessly "embrac[ed] [an] intent to deceive, manipulate, or defraud."  *In re Hertz Glob. Holdings*, *Inc.*, 905 F.3d 106, 114 (3d Cir. 2018) (citing *Avaya*, 564 F.3d at 252).  In the Third Circuit, plaintiffs may establish a "strong inference" that the defendants acted with scienter "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness."  *GSC Partners*, 368 F.3d at 237.  Here, Plaintiffs' allegations fail under either approach.

### A.    Plaintiffs Fail To Allege Motive And Opportunity To Commit Fraud.

Under the motive and opportunity test, a plaintiff must allege facts showing that each individual corporate defendant had the "motive to commit fraud and an opportunity to do so." *Burlington Coat Factory*, 114 F.3d at 1423.  "Blanket assertions of motive and opportunity" will not suffice, and "catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter."  *GSC Partners*, 368 F.3d at 237.  Moreover, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead, plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from this fraud."  *Id.* at 237-38 (collecting cases).

Here, the Amended Complaint fails entirely to allege motive and opportunity.  Plaintiffs allege no facts showing that the Individual Defendants obtained any "concrete and personal

16

benefit" by delaying disclosure of the adverse events in the BELIEVE 1 trial until the study had concluded.  For instance, Plaintiffs fail to allege that the Individual Defendants engaged in insider trading by selling their stock.[8]  Although not determinative, courts have consistently weighed a lack of stock sales by company insiders against an inference of scienter.  *See, e.g.*, *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 558 (D.N.J. 2010) ("[T]he fact that [the individual defendants] did not sell any [of the company's] stock during the Class Period tends to negate scienter."); *Turner v. MagicJack VocalTec, Ltd.*, No. 13-0448, 2014 WL 406917, at *11 (S.D.N.Y. Feb. 3, 2014) ("That three of the four individual Defendants, all high-ranking executives at the Company, did not sell stock during the Class Period . . . rebuts an inference of scienter."); *In re Rigel Pharm., Inc. Sec. Litig.*, 697 F.3d 869, 885-86 (9th Cir. 2012) (the fact that "none of the defendants sold stock during the period between the allegedly fraudulent statements and the subsequent disclosure of the detailed data" "supports the opposite inference" to scienter); *cf. In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 540 (3d Cir. 1999) (allegations of motive are doubtful where some defendants did not sell stock); *In re Burlington Coat Factory,* 114 F.3d at 1423 (same).

At best, Plaintiffs allege that the Individuals Defendants failed to disclose the adverse events in the BELIEVE 1 trial so that the Company could sell common stock pursuant to an Open Market Sales Agreement it had entered with Jefferies LLC and thereby obtain funding for its ongoing research and development activities.  Am. Compl. ¶ 39; Ex. F, 2019 Q2 Form 10-Q at 9.  But generalized allegations applicable to every officer of a company—including the desire to raise

---

[8]    Nor could they have made such allegations.  A review of Zynerba's Form 4 filings, which are required to be filed with the SEC whenever there is any change in the holdings of certain corporate insiders, shows that the Individual Defendants did not acquire or sell Zynerba stock during the Class Period.

capital—fail as a matter of law because they are "so generic that almost every corporate officer in [the defendant]'s position would possess [them]." *Klein v. Autek Corp.*, 147 F. App'x 270, 278 (3d Cir. 2005) (motive to "obtain capital . . . to cover corporate expenses" is so generic that it "must fail as a matter of law"); *see also, e.g.*, *Key Equity Inv'rs Inc. v. Sel-Leb Mktg. Inc.*, 246 F. App'x 780, 786 n.10 (3d Cir. 2007) (an allegation that defendants committed fraud to maintain a line of credit is "nothing more than an ordinary business motive").

Further, trading can support an inference of scienter only where "the stock sales were unusual in scope or timing," and Plaintiffs here plead no such facts. *Oran v. Stafford*, 226 F.3d 275, 290 (3d Cir. 2000). Nor could they. The Company entered the Sales Agreement with Jefferies in June 2017, nearly two years *before* the Class Period. Ex. N, June 9, 2017, Form 8-K, Ex. 10.1. Under the Agreement, the Company was permitted "to issue and sell from time to time" up to $50 million of its common stock, and the Company made multiple common stock transactions under this Open Market Sales Agreement over the life of the Agreement. *Id.* at preamble, § 3(a)(i); Ex. A, 2018 Form 10-K at 102; Ex. F, 2019 Q2 Form 10-Q at 9. Thus, even if a corporate desire to raise capital could give rise to an inference of scienter—and it does not—the stock sale alleged here plainly is insufficient. *In re Egalet Corp. Sec. Litig.*, 340 F. Supp. 3d 479, 512 (E.D. Pa. 2018) (collecting cases holding that trades pursuant to plans adopted before the alleged fraud occurred do not show motive).[9]

---

[9]  Plaintiffs also plead no particularized facts that the Company would not have been able to sell this stock had the adverse events been revealed earlier. Rather, they speculate only that Zynerba "might not have been able to achieve $27 million in net proceeds." Am. Compl. ¶ 39.

**B.      Plaintiffs Fail To Allege Strong Circumstantial Allegations Of Intent To Defraud.**

Unable to allege motive, Plaintiffs attempt to plead circumstantial evidence of conscious misbehavior or recklessness.  Conscious misbehavior or a reckless statement by a defendant "involv[es] not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."  *GSC Partners*, 368 F.3d at 239.

Where, as here, a plaintiff fails to allege motive, the strength of the allegations supporting conscious misbehavior or recklessness must be even greater.  *In re PDI Sec. Litig.*, No. 02-211 (GEB), 2006 WL 3350461, at *8 (D.N.J. Nov. 16, 2006); *In re Bayer AG Sec. Litig.*, No. 03 CIV.1546 WHP, 2004 WL 2190357, at *15 (S.D.N.Y. Sept. 30, 2004) ("Without motive, the strength of circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." (internal quotation marks omitted)).  This is because "fraud without motive 'makes little economic sense.'"  *Leder v. Shinfeld*, No. 06-CV-1805, 2008 WL 2165097, at *6 (E.D. Pa. May 22, 2008) (quoting *In re Digital Island Sec. Litig.*, 357 F.3d 322, 331 (3d Cir. 2004)).  Here, the Amended Complaint is devoid of factual allegations from which a court might infer knowledge on the part of the Individual Defendants that the statements concerning the BELIEVE 1 trial were allegedly false and misleading.

*First*, Plaintiffs try to establish scienter via the conclusory allegation that "[b]y virtue of their positions" at Zynerba, the Individual Defendants "had actual knowledge of the materially false and misleading statements and material omissions" or "acted with reckless disregard for the truth."  Am. Comp. ¶ 50; *see also id.* ¶ 51 ("As the senior managers and/or directors at Zynerba, the Individual Defendants had details of Zynerba's internal affairs.").  Under the PSLRA's

19

exacting pleading requirements, however, "allegations that a securities-fraud defendant, because of his position within the company, 'must have known' a statement was false or misleading are precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate." *Advanta*, 180 F.3d at 539 (alteration in original); *see also Oran*, 226 F.3d at 290 (3d Cir. 2000) (defendants' positions insufficient to plead scienter). Indeed, the Third Circuit has emphasized that "[g]eneralized imputations of knowledge do not suffice, regardless of the defendant's positions within the company." *Advanta*, 180 F.3d at 539.

*Second*, Plaintiffs cannot establish scienter merely by asserting that the Individual Defendants signed Sarbanes-Oxley Act ("SOX") certifications to SEC filings during the putative Class Period. Am. Compl. ¶¶ 29, 33, 38. As a matter of law, signed SOX certifications do not establish scienter. *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 620 (E.D. Pa. 2009) ("The mere fact that the defendants signed GAAP and SOX certifications . . . does not support the plaintiffs' claim that the defendants knew or must have known that their actions presented a danger of misleading buyers or sellers.").

*Third*, Plaintiffs do not plead scienter through their conclusory allegation that, "with the two week dosing period for trial patients already complete and maintenance dosing well underway in the open label BELIEVE I Trial, Defendants knew but failed to disclose that all patients enrolled in in the BELIEVE I Trial suffered treatment emergent adverse events, a majority also suffered treatment related adverse events, and more than one fifth suffered serious adverse events . . . ." Am. Compl. ¶ 44. Indeed, beyond pointing to a federal regulation requiring that certain adverse events be reported to the FDA within 15 days, Am. Compl. ¶ 22, Plaintiffs plead no particularized facts regarding "the who, what, when, where and how" the Individual Defendants purportedly learned about the adverse events. *Avaya*, 564 F.3d at 253. They do not allege facts showing, for

20

instance, when the adverse events arose during the BELIEVE 1 trial, the timing of any required reports to the FDA, that the Individual Defendants played a role in the BELIEVE 1 trial or any reporting to the FDA, that the Individual Defendants received interim reports from Australia and New Zealand about any safety issues that emerged during the BELIEVE 1 trial, that the FDA communicated concerns about the clinical trial or the safety of Zygel with the Individual Defendants, or any other facts showing the Individual Defendants had knowledge of the adverse events at the time the allegedly fraudulent statements were made. Nor do Plaintiffs point to a single confidential witness, internal Company document, or investigative report suggesting the Individual Defendants had knowledge of the adverse events. *See*, *e.g.*, *Sapir v. Averback*, No. 14-7331 (JLL), 2016 WL 554581, at \*10 (D.N.J. Feb. 10, 2016) (dismissing complaint regarding clinical testing of new drug and noting that the "Amended Complaint fails to cite a single document or witness that corroborates allegations of scienter").[10] Accordingly, the allegations of scienter fail.

Moreover, even if they alleged facts showing that Defendants were aware of some adverse events before the alleged misstatements were made, Plaintiffs' scienter allegations would still fail in light of the characteristics of the BELIEVE 1 trial patient population and the nature of the adverse events reported. Plaintiffs do not allege that the patient population in the BELIEVE 1 trial was healthy, such that adverse event reports would have been particularly alarming or unexpected. Thus, while Plaintiffs note that the FDA has special reporting for "unexpected" reactions during

---

[10] A common approach used by securities fraud plaintiffs to try to meet the PSLRA's heightened burden of pleading scienter is to attribute detailed and contemporaneous factual information about the alleged fraud and the defendant's state of mind to confidential witnesses with personal knowledge, often current or former employees of the corporation. *See In re Bofi Holding, Inc. Sec. Litig.*, No. 15-2324-GPC, 2016 WL 5390533, at \*16 (S.D. Cal. Sept, 27, 2016) ("[C]onfidential witnesses have become a staple of securities litigation."). The Amended Complaint is devoid of any such allegations.

21

clinical trials, Am. Compl. ¶ 22, they never say that the adverse events here were unexpected.  As explained above, children with DEE are a medically fragile population and suffer from a number of severe comorbidities.  Ex. E, 2019 Form 10-K at 15; Ex. J, Apr. 15 2020 Form 8-K, Presentation at 33; Ex. I, Apr. 10, 2018 Press Release.  Accordingly, it would not be unexpected or alarming for children with DEE to experience health issues during the BELIEVE 1 trial, particularly given that it lasted for six months.

Furthermore, most of the adverse events during the BELIEVE 1 trial were mild to moderate.  Many of the adverse events related to site dryness, site pain, or sleepiness.  Only 2 of the 10 serious adverse events were ultimately "determined to be possibly related to treatment." Ex. M, Sept. 18, 2019 Press Release at 2.  But even with regard to those two events, Plaintiffs do not allege that the events were unexpected.[11]  Accordingly, for this additional reason, Plaintiffs' scienter allegations fail.  *See*, *e.g.*, *Koncelik v. Savient Pharm., Inc.*, No. 08 CIV. 10262 (GBD), 2010 WL 3910307, at *8 (S.D.N.Y. Sept. 29, 2010) (non-disclosure of serious adverse events not reckless where patients suffering these events had pre-existing risk factors for the development of major cardiac adverse events), *aff'd*, 448 F. App'x 154 (2d Cir. 2012); *cf. Liu v. Intercept Pharm., Inc.*, No. 17-cv-7371 (LAK), 2020 WL 1489831, at *8 (S.D.N.Y. Mar. 26, 2020) ("[S]ome adverse events may be expected to occur randomly, especially with a drug designed to treat people that are already ill." (internal citations omitted)).

---

[11]  Plaintiffs do not—and cannot—allege that the two serious adverse events that were deemed possibly related to the drug—one case of lower respiratory tract infection and one case status epilepticus—are uncommon events in patients with DEE.  *See* Ex. E, 2019 Form 10-K at 15.

C.    **Any Inference Of Scienter Is Neither Compelling Nor As Strong As Non-Fraudulent Inference.**

Even if Plaintiffs had alleged *some* inference of scienter—which they have not—that would not be sufficient. *Tellabs*, 551 U.S. at 324. Instead, Plaintiffs must also allege a ***strong*** inference of scienter that is "***cogent*** and ***at least as compelling*** as any opposing inference of nonfraudulent intent." *Id.* at 314 (emphasis added). This "inherently comparative" inquiry requires the Court to weigh competing inferences to determine whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference." *Winer Family Tr.*, 503 F.3d at 327. Plaintiffs' allegations fall far short.

Plaintiffs claim that Defendants failed to disclose the adverse events for a few months because they intended to deceive the investing public. However, it is much more likely that Defendants did not disclose the adverse events because the BELIEVE 1 trial was ongoing. As explained above, for all of its Phase 2 clinical trials—before, during, and after the Class Period—Zynerba has waited until the completion of the trial to announce the safety and efficacy results, after the overall safety profile of the drug could be analyzed. With regard to the BELIEVE 1 trial specifically, the Company repeatedly—before and during the putative Class Period—told the market that results would not be disclosed until after the trial was completed in the third quarter of 2019. True to its word, the Company disclosed the adverse events in September 2019, upon the trial's completion. In addition, even assuming that the Individual Defendants were aware of the adverse events when they occurred (which Plaintiffs have not adequately pleaded), it is entirely plausible that they did not believe the events were alarming or significant given the broad definition of adverse events, the medically fragile nature of children suffering from DEE and participating in the trial, and the six-month length of the study. In light of all of these facts, it is much more likely that the timing of the Company's adverse event disclosure was driven by a desire

23

to avoid disseminating piecemeal, premature, and incomplete results regarding an ongoing study, as opposed to an attempt to hide the adverse events for a few months in order to defraud investors. *See In re Human Genome Scis. Inc. Sec. Litig.*, 933 F. Supp. 2d 751, 761 (D. Md. 2013) ("While it is possible to infer that [defendant] executives deliberately omitted facts about the attempted and actual suicides in order to hoodwink investors, it is just as plausible, indeed more so, to infer that they only offered vague details about the study because it was ongoing.").

Moreover, the Company's actions, throughout the Class Period and through today, have consistently demonstrated its ongoing belief in Zygel as a potential treatment for DEE and other rare and near rare psychiatric disorders, including for sick children and adolescents.  Zynerba did not suspend the BELIEVE 1 trial at any point, and continued throughout the Class Period to invest time and money into advancing clinical trials for Zygel's use in the treatment of DEE. Additionally, Zynerba has continued to conduct its ongoing Phase 2 clinical trials investigating Zygel's safety and efficacy in the treatment of FXS, ASD, and 22q.  *See* Ex. E, 2019 10-K at 5-6. Finally, Zynerba is continuing work on clinical trials that may be needed to assess Zygel's safety and efficacy in the treatment of DEE in furtherance of pursuing FDA approval for that indication. *See* Ex. M, Sept. 18, 2019 Press Release ("[W]e intend to seek a meeting with the FDA, likely in the first half of next year, to discuss the clinical pathway to approval."); Ex. E, 2019 10-K at 5, 15 ("We intend to meet with the FDA in the first half of 2020 to discuss the clinical path forward in DEE.").  These facts further undermine any inference of fraudulent intent, because it is simply implausible that the Defendants were aware of significant safety problems with Zygel while simultaneously advancing and making additional investments in clinical studies.  *See In re Columbia Labs., Inc. Sec. Litig.*, 602 F. App'x 80, 84 (3d Cir. 2015) (pharmaceutical company's continued investments in clinical studies shows that the "more compelling inference is that [the

individual defendants] did not act with an intent to deceive, manipulate, or defraud investors"); *In re Sanofi Sec. Litig.*, 87 F. Supp. 3d 510, 544 (S.D.N.Y. 2015) ("Defendants' substantial investment of money and personnel in the Lemtrada clinical trials over a several-year period is hard to square with the premise that defendants understood that the study design was fatally flawed or that the results made Lemtrada dead on arrival."), *aff'd sub nom. Tongue v. Sanofi*, 816 F.3d 199 (2d Cir. 2016).

In short, "[t]here is no allegation of any 'red flag' or anything else to indicate that defendants knew that the statements were false or misleading." *In re AstraZeneca Sec. Litig.*, 559 F. Supp. 2d 453, 471 (S.D.N.Y. 2008). Rather, the far more likely explanation is that—as the Company had previously told the market on numerous occasions and has always done—the Company released results for the BELIEVE 1 trial ***only after its completion***, and the Company continues to believe in the efficacy and safety of Zygel for treatment of children and adolescents with DEE and other indications, as evidenced by the Company's own actions. Because this non-fraudulent intent is far more compelling than Plaintiffs' conclusory allegations of scienter, Plaintiffs' claims fail as a matter of law.

### D.    Plaintiffs Cannot Rely On Group Pleading To Establish Scienter.

The Third Circuit explicitly abandoned the group pleading doctrine post-PSLRA because the PSLRA requires scienter to be alleged *with particularity* as to *each Defendant*. *Winer Family Tr.*, 503 F.3d at 336-37. Plaintiffs do not satisfy this demanding standard. Instead, Plaintiffs group all Defendants together, alleging in wholly conclusory fashion that "Defendants had actual knowledge," or, "in the alternative, Defendants acted with reckless disregard for the truth." Am. Compl. ¶ 50. As discussed above, Plaintiffs allege no particularized facts about, among other things, *who* knew about the adverse events in the BELIEVE 1 trial, *when* or *how* the Individual Defendants (or anyone else at Zynerba) learned about the adverse events, and exactly *what* was

discussed about those events.  Thus, Plaintiffs fail to allege facts demonstrating scienter with respect to any Defendant, let alone *each specific Defendant*.  For this additional, independent reason, the Amended Complaint should be dismissed.

## III.   PLAINTIFFS FAIL TO ALLEGE AN ACTIONABLE MISSTATEMENT OR OMISSION.

As demonstrated above, Plaintiffs have not pled a strong inference of scienter and the Amended Complaint should be dismissed for that reason alone.  However, the Amended Complaint also fails because Plaintiffs do not plead an actionable misstatement or omission.

### A.     Silence, Absent A Duty To Disclose, Is Not Actionable.

Plaintiffs' claims are based on alleged omissions, namely Zynerba's failure to disclose adverse events arising during the BELIEVE 1 trial until the close of that trial.  *E.g.*, Am. Compl. ¶¶ 2, 32, 34, 37, 38, 40, 42, 44.  Claims based on omissions must allege with particularity facts giving rise to a duty to disclose and the breach of such duty.  *Burlington Coat Factory*, 114 F.3d at 1432 (noting "there is no general duty on the part of a company to provide the public with all material information" and that the "possession of material nonpublic information alone does not create a duty to disclose it.").

It is well-settled that "[s]ilence, absent a duty to disclose, is not misleading under Rule 10b-5."  *Oran*, 226 F.3d at 285.  Thus, a company does not have a duty to disclose "all material information."  *Id.*  Instead, a duty to disclose arises when disclosure is mandated by statute or "necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Basic Inc. v. Levinson*, 485 U.S. 224, 230 n.6 (1988).

For example, in *In re Adolor Corporation Securities Litigation*, 616 F. Supp. 2d 551 (E.D. Pa. 2009), the defendant conducted multiple clinical trials, testing its drug at two doses.  *Id. at* 556-58.  In the first trial, the results were not statistically significant because a subgroup of patients

included in the study did not respond to the drug. *Id. at* 557. According to the plaintiffs, the company wrongly concealed this information. *Id. at* 569. However, relying on the Third Circuit's decision in *Oran*, the court held that because the company never made any disclosures about patient subgroups, it had no duty to disclose information about which patient subgroups participated in the trial—even if such information would have been "material." *Id*. at 569.

Here, Zynerba had no duty to disclose the adverse events prior to the conclusion of the BELIEVE 1 trial. No statute or regulation required Defendants to disclose the adverse events to investors in an earlier timeframe. Moreover, Plaintiffs do not allege facts establishing any inaccuracy, incompleteness, or misrepresentation with regard to Defendants' statements concerning the BELIEVE 1 trial. Defendants' statements about the BELIEVE 1 trial reported only that the trial was underway. During the course of the trial, Defendants did not make any representations, one way or the other, about whether the trial data suggested that Zygel had side effects or other safety-related risks. Quite the opposite, Defendants consistently stated throughout the putative Class Period that the trial was "ongoing," and that Zynerba would release the "top line results" of the BELIEVE 1 trial in September 2019 (which it did).[12] Defendants had no duty to say more. *See Huang v. Avalanche Biotechnologies, Inc.*, No. 15-CV-03185-JD, 2016 WL 6524401, at *8 (N.D. Cal. Nov. 3, 2016) (where clinical-stage biopharmaceutical company told investors "that top-line results" would not be complete until a certain time period, "it was not reasonable for an investor to

---

[12]   *See, e.g.*, Ex. O, Apr. 2019 Presentation at 21 ("Dosing continues" / "Ongoing"); Ex. C, June 2019 Presentation at 20 (same); Ex. D, Aug. 6, 2019, Form 8-K, Presentation at 20 (same); Ex. A, 2018 Form 10-K at 6 ("We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019); Ex. O, Apr. 2019 Presentation at 5 ("Top Line BELIEVE1 data: 3Q2019"); Ex. C, June 2019 Presentation at 4 (same); Ex. D, Aug. 6, 2019, Form 8-K, Presentation at 4 ("Top line BELIEVE 1 data:  September 2019").

assume the company was speaking as to the efficacy prospects of the drug" before releasing that top-line data).

Moreover, if accepted, Plaintiff's duty argument would lead to absurd results and incredible burdens on pharmaceutical companies. According to Plaintiffs, Zynerba—and every other pharmaceutical company—apparently has a duty *immediately* to disclose each and every adverse event, as soon as it arises during a clinical trial. Not only is such a disclosure regime not legally required, but it would be costly and burdensome for pharmaceutical companies and also bury investors in an avalanche of meaningless information.[13] *See*, *e.g.*, *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 375 (3d Cir. 1993) (warning against inundating investors with "an avalanche of trivial information" (*quoting TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448 (1976)). If, for instance, pharmaceutical companies were required to disclose immediately each and every time that a patient experiences dry skin or sleepiness, then investors would be inundated with numerous public filings regarding trivial events that arose before the trial was completed and the overall efficacy and safety of the drug—including whether the events were causally related to the drug—could be properly evaluated. Not surprisingly, such a disclosure regime finds no support in the law.

Unable to allege that any of the Company's statements regarding the BELIEVE 1 trial were untrue, Plaintiffs allege that statements appearing on Zynerba's website created a duty for Defendants to disclose the adverse events earlier. On its website, Zynerba stated that, compared to the oral administration of CBD, a "potential benefit" of Zygel's transdermal delivery is that it

---

[13]    As the Supreme Court has explained, the materiality standard does not "does not mean that pharmaceutical manufacturers must disclose all reports of adverse events. Adverse event reports are daily events in the pharmaceutical industry . . . ." *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011).

28

may result in "lower incidence of gastrointestinal side effects." [14] *See* Amended Compl. ¶ 26; Ex. P, https://zynerba.com/in-development/zygel.   Based upon this website statement, Plaintiffs appear to allege that Zynerba had a duty to disclose the adverse events earlier.  Am. Compl. ¶ 27. Plaintiffs are wrong.  The website statements were accurate and, as such, do not give rise to a duty to disclose any additional information.

In *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000), investors alleged that the defendant pharmaceutical company committed securities fraud by failing to disclose that 31 patients had experienced heart valve abnormalities when using its drug.  *Id.* at 284.  Plaintiffs alleged that the defendant had a duty to disclose this information, because it had informed the FDA of only 8 such adverse events but had repeatedly stated that the FDA had approved of the drug and found it to be safe.  *Id.* at 279-81.  Specifically, the plaintiffs argued that, by making statements about FDA approval, the defendant put the entire FDA approval process "in play," including that the FDA had not been told about all 31 adverse events.  *Id.* at 284.  The Third Circuit disagreed, explaining that the company did not put in play all information regarding the approval process.  *Id.* at 284-85. Specifically, it "did not make any affirmative characterization that the FDA's approval was based on a complete review of every piece of relevant medical information."  *Id.* at 285 (internal quotation marks omitted).  Rather, it had simply and accurately stated that the FDA found the drug to be safe.  As such, the Company did not have a duty to say more.

Here, the website statement was and is true, *i.e.*, one "potential benefit" of Zygel is that, like other transdermal therapeutics, it may lead to fewer gastrointestinal side effects than oral administration of CBD.  Plaintiffs do not even purport to plead facts showing that Zygel does not

---

[14]   Plaintiffs' Amended Complaint conveniently fails to disclose that the website refers to lower incidence of gastrointestinal side effects merely as a "***Potential*** Benefit of Zygel."  Ex. P, https://zynerba.com/in-development/zygel.

provide such a potential benefit.  Moreover, Zynerba's statements that Zygel may lead to fewer gastrointestinal side effects than oral CBD does not put in play any and all safety information, let alone each and every adverse event reported in the BELIEVE 1 trial—none of which Plaintiffs allege had anything to do with gastrointestinal side effects.

Thus, while Plaintiffs are unhappy with Zynerba's forthright disclosures, the Company was under no duty to say more.  Zynerba told the market that it would not disclose the BELIEVE 1 trial results until the trial's completion in the third quarter of 2019.  Zynerba violated no law by doing exactly what it said it would do.  *Oran*, 226 F.3d at 286; *In re Amarin Corp. PLC Sec. Litig.*, 689 F. App'x 124, 129 (3d Cir. 2017) ("[C]ompanies can control what they have to disclose under [§ 10(b)] by controlling what they say to the market" in the first place.).

**B.**      **<u>Corporate Optimism And Puffery Is Not Actionable.</u>**

To the extent Plaintiffs' claims are based on general corporate optimism or positive interpretations of the results of preclinical studies, other clinical trials, or other research regarding Zygel, they are not actionable.  "[V]ague and non-specific expressions of corporate optimism" or "mere puffery" are not actionable material misrepresentations under the federal securities laws, because no reasonable investor would rely on such statements.  *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010); *Bauer v. Eagle Pharma. Inc.*, No. 16-3091 (JLL), 2017 WL 2213147, at \*6 (D.N.J. May 19, 2017).  Material misrepresentations "must be contrasted with statements of subjective analysis or extrapolations, such as opinions, motives and intentions, or general statements of optimism."  *Bauer*, 2017 WL 2213147, at \*12.  Specifically, "[c]ourts have repeatedly held publicly stated interpretations of the results of various clinical studies to be opinions because reasonable persons may disagree over how to analyze data and interpret results, and neither lends itself to objective conclusions."  *Sanofi*, 87 F. Supp. 3d at 543 (internal quotation marks and alterations omitted) (collecting cases).

As noted above, Plaintiffs point to statements on Zynerba's website stating that one "potential benefit" of Zygel compared to an oral CBD application is fewer gastrointestinal issues. Am. Compl. ¶ 26.  Plaintiffs also state that the Company touted Zygel by stating that "[w]e believe that Zygel may provide an effective treatment for epilepsy."  Am. Compl. ¶ 30.  These are the exact sorts of statements that courts have held do not give rise to claims.  *See, e.g.*, *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 556 (M.D.N.C. 2018) (statements that Phase 3 clinical trials will present a "compelling clinical data set" did not give rise to duty to disclose that safety data from earlier studies "showed a significant and genuine signal for liver toxicity and liver injury" because "the statements are couched as opinion and did not constitute affirmative statements that there are no safety concerns associated with the drug"); *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 488-89 (S.D.N.Y. 2018) (statements that biopharmaceutical company felt "confident" in the study design and "encouraged" by clinical trial's progress were "expressions of puffery and corporate optimism" that did not give rise to an actionable securities fraud claim); *see also Galestan v. OneMain Holdings, Inc.*, 348 F. Supp. 3d 282, 298 (S.D.N.Y. 2018) (corporate optimism rule "permits companies 'to operate with a hopeful outlook,' because corporate officers 'are not required to take a gloomy, fearful or defeatist view of the future'" (quoting *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004))).

Further, Plaintiffs have pleaded nothing to suggest that the Company's opinions about Zygel's potential benefits lacked an objective basis, particularly because:  the BELIEVE 1 trial results were positive and Zygel was well-tolerated overall; Zynerba continued conducting an open-label extension of the DEE clinical trial and clinical trials in other indications (FXS, ASD and 22q); and Zynerba still intends to pursue FDA approval of Zygel for treatment of DEE.  Ex. J, Apr.15, 2020 Form 8-K, Presentation; Ex. M, Sept. 18, 2019 Press Release at 1-2; Ex. E, 2019

31

Form 10-K at 5-7.  *See Hirtenstein*, 348 F. Supp. 3d at 557 (plaintiffs failed to plead, and could not plead, that corporate management lacked a sincerely held belief in optimistic statements regarding the clinical trial result, where the trial results "met their primary endpoint and the overall safety profile of the drug was subject to reasonable debate"); *Sanofi*, 87 F. Supp. 3d at 544 (despite withholding from the public the FDA's expressed concerns about trial design,   defendants' opinions regarding the "encouraging" results of clinical trials, still had "ample basis in fact," where FDA allowed trial to proceed to Phase 3 and evidence in academic journals supported defendants' interpretation of study results).

### C.      <u>Defendants' Statements Are Protected By The PSLRA's Safe Harbor Provision.</u>

Finally, the PSLRA's Safe Harbor Provision further insulates Defendants against Section 10(b) liability to the extent that Plaintiffs' claims are based on Defendants' statements regarding the potential benefits of Zygel.  The term "forward-looking statement" is defined in the Safe Harbor statute to include "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer," as well as "any statement of the assumptions underlying or relating to any" forward-looking statement. 15 U.S.C. § 78u–5(i)(1)(B), (D).  The term is broadly defined and includes "projections of future performance, plans and objectives for future operations, and assumptions underlying statements about future financial, economic, or operational performance."  *Aetna*, 617 F.3d at 279; *Avaya*, 564 F.3d at 255.  Here, Zynerba's disclosures throughout the putative Class Period made clear that any discussion about the potential benefits of Zygel for children with DEE was subject to BELIEVE 1 trial results that would not be reported until the future:  "We expect to report top line results from the BELIEVE 1 trial in the third quarter of 2019."  *See, e.g.*, Ex. E, 2019 Form 10-K at 6; Ex. B, 2019 Q1 Form 10-Q at 17.

Forward-looking statements accompanied by meaningful cautionary language are protected by the PSLRA's Safe Harbor Provision.  *Avaya*, 564 F.3d at 254; *Egalet*, 340 F. Supp. at 501.  As Plaintiffs concede in the Amended Complaint, Zynerba disclosed cautionary language "regarding the risks of poor clinical results," Am. Compl. ¶ 31.  Indeed, Plaintiffs even quote some of the cautionary language in the Amended Complaint:

- ***"Because the results of preclinical studies and earlier clinical trials are not necessarily predictive of future results, Zygel may not have favorable results in our planned clinical trials."***

- ***"Failures or delays in our clinical trials of Zygel could result in increased costs to us and could delay, prevent or limit our ability to generate revenue and continue our business."***

- ***"The regulatory approval process of the FDA, the EMA and other comparable foreign regulatory authorities are lengthy, time-consuming and inherently unpredictable, and if we are ultimately unable to obtain regulatory approval for our product candidates, our business will be substantially harmed."***

Am. Compl. ¶ 31 (quoting Ex. A, 2018 Form 10-K at 45, 47) (emphasis in Amended Complaint and in original).  These are just some of the extensive, specific risk disclosures that Zynerba made concerning the risks of potential setbacks in Zygel's clinical trials and the risk that the drug would never obtain FDA approval and never be commercialized.  *See supra* at 9-11.  Although Plaintiffs dismiss these disclosures as "generic" and "boilerplate," Am. Compl. ¶ 31, they were carefully tailored to Zynerba's unique risks and, in fact, specifically warned of the risk Plaintiffs claim manifested here: "significant setbacks caused by . . . safety . . . observations in clinical trials, including adverse events."  Ex. A, 2018 Form 10-K at 45.  Zynerba's forward-looking statements are therefore not actionable under the PSLRA.

## IV.     PLAINTIFFS FAIL TO PLEAD CONTROL PERSON LIABILITY.

Where, as here, Plaintiffs have not alleged a primary violation of § 10(b), there can be no secondary liability for control persons under § 20(a).  *In re Merck & Co., Inc. Sec. Litig.*,

33

432 F.3d 261, 276 (3d Cir. 2005) (affirming dismissal of Section 20(a) claims for failure to plead predicate violation of Section 10(b)); 15 U.S.C. § 78t(a).  Plaintiffs' § 20(a) claim fails for this reason alone, and as with the rest of the Amended Complaint, should be dismissed.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that this Court dismiss the Amended Complaint *with prejudice*. *See, e.g.*, *Oran*, 226 F.3d at 291 (affirming dismissal of securities claims with prejudice in part because further amendment of the complaint would be futile).

Respectfully submitted,

Dated: April 23, 2020

*/s/ David H. Kistenbroker*
David H. Kistenbroker
  (admitted *pro hac vice*)
DECHERT LLP
35 West Wacker Drive
Suite 3400
Chicago, IL 60601-1608
Tel: 312-646-5800
Facsimile: 312-646-5858
david.kistenbroker@dechert.com

Michael S. Doluisio (Pa. 75060)
Tiffany Engsell (Pa. 320711)
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104
Tel:  215-994-4000
Facsimile: 215-994-2222
michael.doluisio@dechert.com
tiffany.engsell@dechert.com

*Attorneys for Defendants*