## UNITED STATES DISTRICT COURT
### EASTERN DISTRICT OF PENNSYLVANIA

———————————————————————

| | | |
|---|---|---|
| SCOTT WHITELEY and HARRY BERGER, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | Case No. 2:19-cv-04959-NIQA |
| Plaintiffs, | ) ) ) | ORAL ARGUMENT REQUESTED |
| v. | ) ) | |
| ZYNERBA PHARMACEUTICALS, INC., ARMANDO ANIDO, and JAMES E. FICKENSCHER, | ) ) ) ) ) | |
| Defendants. | ) ) | |

———————————————————————

## REPLY BRIEF IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

I.   PLAINTIFFS DO NOT ADEQUATELY PLEAD SCIENTER. ..................................... 3

    A.   Plaintiffs Do Not Plead A Strong Inference Of Reckless Behavior. ..................... 3

        1.   Plaintiffs Do Not Plead Facts Showing That Each Defendant Knew Of The Adverse Events. ........................................................................... 4

        2.   The Core Operations Doctrine Does Not Save Plaintiffs' Claims............. 7

        3.   Plaintiffs' Other Arguments Are Not Supported By The Law. ............... 10

    B.   Plaintiffs' Motive Allegations Also Fail.............................................................. 12

    C.   The Non-Fraudulent Explanation Is Much More Compelling Than Any Inference Of Scienter. ........................................................................................ 14

II.   NO ACTIONABLE MISSTATEMENT OR OMISSION ALLEGED. .......................... 15

    A.   Zynerba's Website Statements About Zygel's Potential Benefits Do Not Give Rise To A Duty To Disclose. ...................................................................... 15

        1.   The Website Statements Are Puffery........................................................ 16

        2.   The Website Statements Do Not Put "In Play" Any And All Information Related To The Safety of Zygel......................................... 16

    B.   Zynerba's Statements Concerning The Phase 1 Results Do Not Give Rise To A Duty To Disclose. ........................................................................................ 19

    C.   Zynerba's Cautionary Statements Do Not Give Rise To A Duty To Disclose............................................................................................................... 20

    D.   There Is No Generalized Duty To Update Applicable Here............................... 22

    E.   Plaintiffs' Other Arguments Are Unsupported By Third Circuit Law ................ 23

CONCLUSION................................................................................................................. 25

## TABLE OF AUTHORITIES

**CASES**

*Anderson v. Abbott Labs.*,
140 F. Supp. 2d 894 (N.D. Ill. 2001), *aff'd sub nom. Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001)..................................................................................24

*Chiarella v. United States*,
445 U.S. 222 (1980)..................................................................................................25

*City of Edinburgh Council v. Pfizer, Inc.*,
754 F.3d 159 (3d Cir. 2014).................................................................14, 17, 23, 25

*Emps. Ret. Sys. of Puerto Rico Elec. Power Auth. v. Conduent Inc.*,
Civ. No. 19-8237(SDW)(SCM),
2020 WL 3026536, at *7–8 (D.N.J. June 5, 2020) .....................................................8

*Gillis v. QRX Pharma Ltd.*,
197 F. Supp. 3d 557 (S.D.N.Y. 2016)........................................................................14

*Glaser v. The9, Ltd.*,
772 F. Supp. 2d 573 (S.D.N.Y. 2011)..........................................................................4

*Gregory v. ProNAi Therapeutics Inc.*,
297 F. Supp. 3d 372 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018).........19

*GSC Partners CDO Fund v. Washington*,
368 F.3d 228 (3d Cir. 2004).....................................................................................13

*Hall v. Johnson & Johnson*,
No. 18-1833, 2019 WL 7207491 (D.N.J. Dec. 27, 2019)............................................4

*Hirtenstein v. Cempra, Inc.*,
348 F. Supp. 3d 530 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*,
No. 18-2415, 2020 WL 2770554 (4th Cir. May 28, 2020)........................................18

*Howard v. Arconic Inc.*,
395 F. Supp. 3d 516 (W.D. Pa. 2019).......................................................................18

*In re Aetna, Inc. Sec. Litig.*,
617 F.3d 272 (3d Cir. 2010)......................................................................................16

*In re Amarin Corp. PLC*,
No. 13-cv-6663 (FLW)(TJB), 2015 WL 3954190 (D.N.J. Jun. 29, 2015).................7

*In re Ariad Pharm., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016)........................................................................................6

*In re Biogen Idec, Inc. Sec. Litig.*,
   No. CIV. A. 05-10400-WGY, 2007 WL 9602250 (D. Mass. Oct. 25, 2007),
   *aff'd sub nom. N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC
   Inc.*, 537 F.3d 35 (1st Cir. 2008)...................................................................................6

*In re Burlington Coat Factory Sec. Litig.*,
   114 F.3d 1410 (3d Cir. 1997)......................................................................................23

*In re Campbell Soup*,
   145 F. Supp. 2d 574 (D.N.J. 2001) ..............................................................................4

*In re Columbia Labs., Inc., Sec. Litig.*,
   602 F. App'x 80 (3d Cir. 2015) ..................................................................................14

*In re Delcath Sys., Inc. Sec. Litig.*,
   36 F. Supp. 3d 320 (S.D.N.Y. 2014)...........................................................................10

*In re Elan Corp. Sec. Litig.*,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)............................................................................6

*In re Galena Biopharma, Inc. Sec. Litig.*,
   336 F. Supp. 3d 378 (D.N.J. 2018) .............................................................................24

*In re Heartland Payment Sys., Inc., Sec. Litig.*,
   No. 09-1043, 2009 WL 4798148 (D.N.J. Dec. 7, 2009)...............................................18

*In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*,
   No. CV 17-341, 2020 WL 1479128 (E.D. Pa. Mar. 25, 2020).........................3, 4, 5

*In re Navient Corp. Securities Litigation*
    Civ. No. 17-8373 (RBK/AMD), 2019 WL 7288881, at *10 (D.N.J. Dec. 30,
    2019) ...........................................................................................................................8

*In re Safeguard Scis.*,
   No. CIV.A.01-3208, 2004 WL 2700291 (E.D. Pa. Nov. 18, 2004) ...................................24

*In re Sofamor Danek Grp., Inc.*,
   123 F.3d 394 (6th Cir. 1997) ......................................................................................24

*In re Urban Outfitters, Inc. Sec. Litig.*,
   103 F. Supp. 3d 635 (E.D. Pa. 2015) .......................................................................7, 8

*Institutional Inv. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3d Cir. 2009)..............................................................................3, 4, 11

*Kakkar v. Bellicum Pharm., Inc.*,
   No. 4:18-CV-338, 2020 WL 2845279 (S.D. Tex. May 29, 2020)............................6

iii

*Key Equity Investors Inc. v. Sel-Leb Mktg. Inc.*,
  246 F. App'x 780 (3d Cir. 2007) ................................................................12

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011) ....................................................................................21

*Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*,
  720 F. Supp. 2d 517 (D.N.J. 2010) ..............................................................8

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) .................................................................17, 24

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) .........................................................................7

*SEB Inv. Mgmt. AB v. Endo Int'l, PLC*
  351 F. Supp. 3d 874 (E.D. Pa. 2018) ...........................................................8

*Sec. Police & Fire Prof'ls of Am. Ret. Fund v. Pfizer, Inc.*
  No. 10-CV-3105 SDW/MCA, 2013 WL 1750010, at *6 (D.N.J. Apr. 22,
  2013), *aff'd sub nom. City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159
  (3d Cir. 2014) ............................................................................................17

*Shapiro v. UJB Fin. Corp.*,
  964 F.2d 272 (3d Cir. 1992) .......................................................................17

*Teamsters Local 456 Pension Fund v. Universal Health Servs.*,
  396 F. Supp. 3d 413 (E.D. Pa. 2019) .........................................................17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ...................................................................................14

*United States v. Schiff*,
  602 F.3d 152 (3d Cir. 2010) .......................................................................23

*Williams v. Globus Med., Inc.*,
  869 F.3d 235 (3d Cir. 2017) .......................................................................21

*Winer Family Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .........................................................................3

**STATUTES**

Private Securities Litigation Reform Act ..............................................1, 4, 12

Securities Exchange Act of 1934, § 10(b) ...................................................24

**OTHER AUTHORITIES**

17 C.F.R. § 211 ...................................................................................................................................24

17 C.F.R. § 229.303(a)(3)(H) .............................................................................................................24

17 C.F.R. § 231 ...................................................................................................................................24

17 C.F.R. § 241 ...................................................................................................................................24

Fed. R. Civ. P. 9(b) .................................................................................................................1, 4, 12

**INTRODUCTION**

As demonstrated in Defendants' opening brief in support of their Motion to Dismiss (Dkt. 24) ("Mot. Dismiss"), two fatal flaws doom Plaintiffs' Amended Complaint (Dkt. 21). First, Plaintiffs do not come close to satisfying the strict requirements for pleading scienter under Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act ("PSLRA"), which, under Plaintiffs' recklessness theory, requires Plaintiffs to plead specific facts that Defendants knew or should have known that they were misrepresenting material facts, including by ***specifically identifying the reports or statements*** that Defendants received that are contradictory to statements they made during the Class Period. Second, Plaintiffs do not allege that Defendants made a material misstatement because they fail to allege facts showing that Defendants had a duty to disclose earlier the adverse events that arose during the BELIEVE 1 clinical trial of Zynerba's product candidate, Zygel. Throughout the putative Class Period, Zynerba did not speak about the safety data from the BELIEVE 1 trial or any data from the trial for that matter. Instead, Zynerba repeatedly told the market that it would not disclose the BELIEVE 1 trial results until the trial's completion in the third quarter of 2019. Zynerba violated no law by doing exactly what it said it would do.

As discussed below, Plaintiffs' Opposition Brief (Dkt. 29) ("Pls.' Opp. Br.") does nothing to save their claims. Try as they might, Plaintiffs cannot explain away their failure to plead with specificity any facts showing that the Individual Defendants were aware in real time of the adverse events observed during the BELIEVE 1 trial. Indeed, Plaintiffs do not cite any public documents, confidential witness testimony, or internal documents showing that the Defendants were aware of the adverse events that were being observed at the clinical trial sites. Nor do Plaintiffs plead any facts to show when Individual Defendants learned about the adverse events, that Defendants believed those events to be related to patient's treatment with Zygel, or that Defendants were

concerned about the impact of those events on the Company's ability to obtain FDA approval for Zygel, either for the treatment of DEE or any of the several other conditions for which Zygel is under evaluation.  Plaintiffs do not and cannot plead such facts for multiple reasons, including that: (1) most of the events reported were mild to moderate events in an already medically fragile patient population; (2) only two of the serious adverse events reported during the BELIEVE 1 trial were ultimately determined to be even possibly related to Zygel; (3) Zynerba is still pursuing FDA approval of Zygel today, including for the treatment of DEE; and (4) Plaintiffs do not plead that the FDA has ever shut down any clinical trial involving Zygel or expressed any concerns about its safety.

Equally unpersuasive is Plaintiffs' claim that Defendants had a motive to commit fraud based upon the Company's sale of stock, because Plaintiffs fail to explain why Zynerba's stock sales were any different than a company's generic desire to raise capital and do not, and cannot, plead that Zynerba would have been unable to sell stock after releasing safety data from the BELIEVE 1 trial.  Because Plaintiffs do not allege scienter, the Amended Complaint should be dismissed.

Likewise, Plaintiffs' arguments that Defendants had a duty to speak sooner are contrary to the law.  The Company's website statement that a potential benefit of Zygel (a transdermal gel) is that it gives rise to a lower incidence of gastrointestinal issues than CBD delivered by oral methods does not put "in play" each and every piece of information in any way related to Zygel's safety. To find otherwise would require Zynerba and every other pharmaceutical company that makes any public statement about a possible benefit of a drug product to disclose each and every adverse event that occurs during a clinical trial.  This is not the law.  Nor did any other statement or action made by Zynerba create a duty for the Company to disclose the adverse events earlier.  Thus,

Plaintiffs fail to allege an actionable material misstatement. Accordingly, for this additional reason, Plaintiffs' Amended Complaint should be dismissed with prejudice.

## I. PLAINTIFFS DO NOT ADEQUATELY PLEAD SCIENTER.

To allege scienter, Plaintiffs must plead facts that give rise to a strong inference of conscious or reckless misbehavior. *Institutional Inv. Grp. v. Avaya, Inc.*, 564 F.3d 242, 276 (3d Cir. 2009)). Group pleading is not sufficient; instead, Plaintiffs must make particularized factual allegations with regard to *each* Defendant and *each* alleged misrepresentation. *See Winer Family Tr. v. Queen*, 503 F.3d 319, 337 n.6 (3d Cir. 2007).

Here, Plaintiffs do not even attempt to argue that Defendants engaged in conscious misbehavior. Instead, they rely entirely on a theory of recklessness. Pls.' Opp. Br. at 23-24. As discussed below, however, Plaintiffs' allegations fail. Likewise, Plaintiffs' allegations regarding Defendants' purported "motive"—which Plaintiffs concede "cannot establish a strong inference of scienter" on their own, Pls.' Opp. Br. at 33—are deficient as a matter of law. Accordingly, the Amended Complaint should be dismissed in its entirety because Plaintiffs have failed to allege scienter.

### A. Plaintiffs Do Not Plead A Strong Inference Of Reckless Behavior.

As Plaintiffs' own cases make clear, "[a] reckless statement is one involving not merely simple, or even inexcusable negligence, but an ***extreme departure*** from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is ***either known to the defendant or is so obvious that the actor must have been aware of it***." *Avaya,* 564 F.3d at 267 n.42 (internal citation and quotation marks omitted) (emphasis added). To plead recklessness, Plaintiffs must "specifically allege facts constituting strong circumstantial evidence that 'defendants knew, or, more importantly, should have known that they were misrepresenting material facts related to the corporation.'" *In re Innocoll Holdings Pub. Ltd. Co. Sec. Litig.*, No.

CV 17-341, 2020 WL 1479128, at *8 (E.D. Pa. Mar. 25, 2020) (quoting *Hall v. Johnson & Johnson,* No. 18-1833, 2019 WL 7207491, at *20 (D.N.J. Dec. 27, 2019)). "A plaintiff relying on a recklessness theory must specifically allege 'defendants' knowledge of facts or access to information contradicting their public statements.'" *Id.* (quoting *In re Campbell Soup,* 145 F. Supp. 2d 574, 599 (D.N.J. 2001)). It is not enough, however, for a plaintiff to allege that the defendants generally had access to relevant information. Rather, the plaintiff "'must *specifically identify the reports or statements* that are contradictory to the statements made,' or must '*provide specific instances in which Defendants received information* that was contrary to their public declarations." *Id.* (quoting *Glaser v. The9, Ltd.,* 772 F. Supp. 2d 573, 588 (S.D.N.Y. 2011)) (emphasis added). Plaintiffs fall far short.

### 1.    Plaintiffs Do Not Plead Facts Showing That Each Defendant Knew Of The Adverse Events.

Here, Plaintiffs plead no particularized facts—as Rule 9(b) and the PSLRA require—regarding "who, what, when, where and how" the Individual Defendants purportedly learned about the adverse events. *Avaya*, 564 F.3d at 253. The Amended Complaint says nothing about Zynerba's or the Individual Defendants' process for monitoring, managing, and evaluating results from the BELIEVE 1 trial. Plaintiffs likewise do not allege other basic facts, such as when the adverse events arose, what role (if any) the Individual Defendants played in the BELIEVE 1 trial or FDA reporting, or whether the FDA communicated to the Individual Defendants concerns (if any) about the BELIEVE 1 clinical trial or Zygel's safety. Thus, Plaintiffs fall far short of alleging "specific instances in which Defendants received information" regarding the adverse events in the BELIEVE 1 trial. *Innocoll Holdings*, 2020 WL 1479128, at *8. Indeed, unlike in many of the cases Plaintiffs cite, Plaintiffs do not rely upon even a single confidential witnesses or cite a single internal Company document.

Rather than alleging these necessary facts, Plaintiffs ask this Court to draw an "inference" that "Defendants either knew of the safety data virtually in real time or ignored the safety data." Pls.' Opp. Br. at 29.[1] Plaintiffs base their request for an inference on (1) the importance of Zygel to Zynerba's survival; (2) FDA reporting requirements for clinical trials; and (3) generalized allegations that the Company had "a Zygel safety database tracking safety events during clinical testing."[2] Pls.' Opp. Br. at 27-28; Am. Compl. ¶ 23.

There are at least two significant problems with Plaintiffs' argument. First, if Plaintiffs' argument were accepted, then every corporate executive who works at a pharmaceutical company that has an important drug under development and a safety tracking database could be sued for securities fraud. That obviously is not correct. Rather, securities plaintiffs must do far more: they must, at a minimum, "provide specific instances in which Defendants received information that was contrary to their public declarations." *Innocoll Holdings*, 2020 WL 1479128, at *8.

Second, numerous courts have rejected virtually identical, or even stronger, allegations on a motion to dismiss:

---

[1] By asking the Court to infer when the adverse events occurred, Plaintiffs effectively concede that they plead no facts regarding the actual timing of those events: "At the March 11, 2019 commencement of the Class Period, the BELIEVE 1 clinical trial was already half-over. As such, and given the staggering percentage of trial participants that suffered safety events, it is reasonable to *infer* that participants had already manifested material SAEs, TEAEs, and TRAEs by that time." Pls.' Opp. Br. at 32.

[2] Plaintiffs claim that they alleged that "Defendants knew which trial participants received the drug and which suffered safety events when they occurred," citing to Paragraph 23 of their Amended Complaint. However, this contention both (1) improperly lumps all Defendants together and (2) is wholly conclusory. Moreover, Paragraph 23 does not contain these allegations (or any other allegation about Defendants' knowledge). It provides in pertinent part merely as follows: "An open-label trial, as opposed to one that is blind or double-blind, is one in which both the researchers and trial patients know which treatment the patient is receiving. The Company maintained a Zygel safety database tracking safety events during clinical testing of Zygel." Am. Compl. ¶ 23.

5

- *Kakkar v. Bellicum Pharm., Inc.*, No. 4:18-CV-338, 2020 WL 2845279, at \*2, 4 (S.D. Tex. May 29, 2020) (allegations that company "had a safety database for the clinical trials," in which "[a]dverse events were entered . . .  within 24 hours of occurrence" and that company was "required to notify the FDA of adverse events within 15 days" did not allege "strong inference of scienter" as to any individual defendant);

- *In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 751-52 (1st Cir. 2016) (complaint failed to allege scienter where plaintiffs alleged that defendants possessed "contemporaneous" knowledge of various serious events "based on their continuous monitoring of the PACE 2 trial data," but did not "allege any specific facts about when the defendants learned of these adverse events or even when the adverse events occurred," nor "whether and to what extent the defendants were involved in collecting or reviewing the relevant data");

- *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 220 & n.29 (S.D.N.Y. 2008) (allegations that senior executives "were charged with approving and closely monitoring the progress of the development and marketing of Tysabri, including the manner in which clinical trials were designed and conducted, [and] the tracking of adverse events, . . . is a legal conclusion regarding the interpretation of [an agreement between two companies developing the drug], and does not address whether or when a causal relationship between adverse events and Tysabri was established");

- *In re Biogen Idec, Inc. Sec. Litig.*, No. CIV. A. 05-10400-WGY, 2007 WL 9602250, at \*11 (D. Mass. Oct. 25, 2007), *aff'd sub nom. N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35 (1st Cir. 2008) (no strong inference of scienter where

6

plaintiffs did "not provide any indication as to *when* the defendants personally learned, if ever, of these [adverse] clinical results").

These cases make clear that Plaintiffs' generalized allegations about Defendants' knowledge do not give rise to a strong inference of reckless misbehavior as to any Individual Defendant. The Amended Complaint is completely silent on the crucial questions of whether and to what extent the Individual Defendants were involved in reviewing and collecting the relevant data, when the adverse events occurred, and when the Individual Defendants became aware of them. As such, the scienter allegations fail as a matter of law.

### 2. The Core Operations Doctrine Does Not Save Plaintiffs' Claims.

Unable to provide even one specific factual allegation about when each of the Individual Defendants purportedly learned of the adverse events, Plaintiffs attempt to salvage their claims by relying on the core operations doctrine. This attempt also fails. As Plaintiffs' own cases provide, courts will not infer scienter under this doctrine absent ***additional*** allegations showing that ***specific information related to the alleged fraud*** was conveyed to ***each*** defendant. As the Third Circuit has explained, the core operations doctrine has "limited precedential value," because "'corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter—at least absent some additional allegations of specific information conveyed to management and related to fraud.'" *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 246-47 (3d Cir. 2013); *see also In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653-54 (E.D. Pa. 2015) (scienter is alleged under core operations doctrine only when the plaintiff makes "additional allegations connecting the executives' positions to their knowledge"); *In re Amarin Corp. PLC*, No. 13-cv-6663 (FLW)(TJB), 2015 WL 3954190, at *12 (D.N.J. Jun. 29, 2015) ("While it is true that false or misleading statements by key executives regarding a company's lead product or core business practices will weigh in favor of finding a strong inference of scienter, [courts] will not

make such an inference absent particularized allegations showing that defendants had ample reason to know of the falsity of their statements." (citations and internal quotation marks omitted)); *Nat'l Junior Baseball League v. PharmaNet Dev. Grp., Inc.*, 720 F. Supp. 2d 517, 556 (D.N.J. 2010) (rejecting core operations doctrine where there were no "other individualized allegations").

In fact, *each* of the cases Plaintiffs rely upon makes clear that the core operations doctrine does *not* supplant the requirement that Plaintiffs must plead particularized facts about the knowledge of each Individual Defendant. *Urban Outfitters* involved allegations, based on statements by confidential witnesses, that the officer defendants would have been alerted to extensive sales declines and markdowns in the company's North American stores. 103 F. Supp. 3d at 654. In *SEB Investment Management AB v. Endo International, PLC*, plaintiffs alleged that individual defendants had access to detailed information regarding the company's business operations and financial condition, including information regarding the efficacy of a reformulated drug. The plaintiffs also pointed to the defendants' public comments, which confirmed their intimate knowledge of the clinical data. 351 F. Supp. 3d 874, 906 (E.D. Pa. 2018). *Employees Retirement System of Puerto Rico Electrical Power Authority v. Conduent Inc.* included specific allegations that the individual defendant supervised the company's operations, met with customers who told him about problems, and personally spoke about those problems. Civ. No. 19-8237(SDW)(SCM), 2020 WL 3026536, at *7–8 (D.N.J. June 5, 2020). And the plaintiffs in *In re Navient Corp. Securities Litigation* relied upon confidential witness testimony and specifically alleged that the defendants had received Department of Education audit reports which had concluded that the company was engaged in an improper forbearance-steering scheme. Civ. No. 17-8373 (RBK/AMD), 2019 WL 7288881, at *10 (D.N.J. Dec. 30, 2019).

8

Unlike in these cases, Plaintiffs here make *no* specific allegations that the Individual Defendants or anyone else at Zynerba learned of the adverse events in real time. They do not rely upon confidential witnesses or internal Company documents. Nor do they allege specific facts about how the process for reporting adverse events to Company management normally works at Zynerba, or about the standard practice for reporting events to senior officers at any other pharmaceutical company. Rather, they simply allege that Zygel was very important to the Company and that, as a result, the Defendants must have known in real time about the adverse events that were occurring. This sort of argument sweeps far too broadly and fails as a matter of law.

Moreover, Plaintiffs overstate the importance of the BELIEVE 1 trial. While it is true that Zygel was the only product in Zynerba's pipeline, Plaintiffs do not plead facts suggesting that Defendants were singularly focused on the BELIEVE 1 trial. During the Class Period, Zynerba was investigating, and continues today to investigate, the use of Zygel for treatment of *multiple* different health conditions, not just DEE. Indeed, both before and during the putative Class Period, the Company conducted multiple Phase 2 clinical trials for Zygel for the treatment of FXS, ASD, 22q, and DEE. Mot. Dismiss at 7. As such, Plaintiffs are wrong to suggest that the results from BELIEVE 1 trial would themselves make or break the Company [3]

---

[3] Plaintiffs seem to suggest that Zynerba's May 8, 2019 Press Release referred to the BELIEVE 1 trial as "transformational." Pls.' Opp. Br. at 26 (citing Defs.' Ex. B (Dkt. 24-5)). Not so. Instead, the Press Release states that the Company was entering a "transformational period" during which it expected top line data from "four neuropsychiatric disorder trials." *Id.*

### 3.   Plaintiffs' Other Arguments Are Not Supported By The Law.

Unable to support their claims through specific factual allegations, Plaintiffs fall back on a number of miscellaneous arguments in the hopes that the Court will overlook the shortcomings of the Amended Complaint.  Each of Plaintiff's arguments is unsupported by the law.

First, Plaintiffs attempt to overcome their pleading deficiencies by claiming that the Individual Defendants must have known about the BELIEVE 1 adverse events because Zynerba is a relatively small company.  Pls.' Opp. Br. at 26.  Once again, Plaintiffs' case law does not help them.  In *In re Delcath Systems, Inc. Sec. Litigation*, the court relied not just on the company's small size.  Rather, the court based its decision on numerous specific allegations, including: (1) statements from confidential witnesses regarding the CEO's knowledge; (2) the CEO's public statements that "evinced a familiarity with the data in the trials"; and (3) the Company's revised New Drug Application, which "suggest[ed] that Defendants knew that the results of its Phase III trials were not as strong as they represented in public statements."  36 F. Supp. 3d 320, 335 (S.D.N.Y. 2014).  Here, Plaintiffs make no analogous allegations.

Second, citing no case law, Plaintiffs claim that the Individual Defendants' prior experience in the pharmaceutical industry and with the FDA approval process supports a finding of scienter.  Pls.' Opp. Br. at 26-27.  Plaintiffs fail to explain, however, why this prior experience means that the Individual Defendants knew in real time about the adverse events from each of the several different clinical trials that were ongoing during the putative Class Period.  Moreover, as explained in Zynerba's opening brief, it would make perfect sense for the Individual Defendants, consistent with their past practice, to wait until the BELIEVE 1 trial was completed before assessing and disclosing the test results.  For each of its Phase 2 clinical trials—including the BELIEVE 1 trial—Zynerba always has waited until the completion of the trial to analyze and announce safety and efficacy results.  Mot. Dismiss at 9- 11, 23.

10

Third, Plaintiffs claim that the number and severity, or "magnitude," of adverse events reported during the BELIEVE 1 trial are indicative of scienter. But Plaintiffs cite no case holding that a pharmaceutical company and all of its high-level executives necessarily act with scienter if they fail to disclose adverse events that surpass some unidentified "magnitude" threshold. In fact, the only case cited by Plaintiffs, *Avaya*, did not even involve a pharmaceutical company and, in that case, the plaintiff made specific allegations regarding the defendants' knowledge. In *Avaya*, the company issued baseless financial projections and positive portrayals to the market despite knowing that projections and portrayals were impossible to fulfill in light of intense price competition, extensive discounting, and problems with the company's marketing strategy. Plaintiffs' scienter allegations were supported by, among other things, the accounts of confidential witnesses, analyst reports, and specific alleged "admissions" by the defendant officers. *Avaya*, 564 F.3d at 270-71. Here, by contrast, Plaintiffs rely upon no confidential witnesses, no contemporary report, and no alleged "admissions" by the Individual Defendants. What's more, Plaintiffs offer no specific facts to support their claim that the "magnitude" of the adverse events, either in number or terms of severity, was notable, especially in light of the characteristics of the BELIEVE 1 trial patient population and the nature of the adverse events reported. Mot. Dismiss at 11-12, 23. For instance, Plaintiffs have alleged no facts showing that the Defendants learned of the adverse events in the BELIEVE 1 trial during the Class Period, let alone concluded the events were treatment-related or made any assessment of the impact of the adverse events reported during the BELIEVE 1 trial on Zygel's overall safety profile.

Finally, Plaintiffs purport to take Zynerba to task for a using a "set it and forget it" approach to clinical trials, whereby: (1) Zynerba consistently and repeatedly told the market before and during the course of the BELIEVE 1 trial that it would not announce results until the third quarter

11

of 2019, after the trial was over; and (2) Zynerba, true to its word, disclosed the results after the BELIEVE 1 trial was over.  Plaintiffs do not cite a single case or regulation holding that it is improper for a pharmaceutical company to take this approach.  Nor do Plaintiffs allege that this approach—waiting until a clinical trial is over before disclosing information about adverse events that occurred during the trial—falls outside of standard practice in the pharmaceutical industry.  And, more importantly, they fail to cite a single case holding that a company and its executives act with an intent to defraud by acting consistently with past practice and by doing exactly what they told the market they would do.

### B.      Plaintiffs' Motive Allegations Also Fail

Plaintiffs' motive arguments fare no better.  Plaintiffs' motive arguments rely exclusively on Zynerba's May 2019 sale of common stock pursuant to an Open Market Sales Agreement it entered with Jefferies LLC.  Pls.' Opp. Br. at 33-34.  This argument lacks support in both the law and facts.

As demonstrated in Defendants' opening brief, generalized allegations that apply to every officer of a company—including the desire to raise capital—do not give rise to scienter.   Mot. Dismiss at 17-18.  Plaintiffs do not cite any case from this Circuit suggesting that this fundamental principle does not apply to clinical stage pharmaceutical companies that are seeking to fund clinical trials.  In fact, in the only in-circuit case Plaintiffs cite, *Key Equity Investors Inc. v. Sel-Leb Marketing Inc.*, the Third Circuit *rejected* the very argument that Plaintiffs make here.  In that case, the plaintiff alleged "that defendants had a motive to fraudulently misstate earnings because Sel–Leb needed the Merrill Lynch line of credit to operate."  The Third Circuit held that this allegation was *insufficiently particular* under Rule 9(b) and the PSLRA, explaining that raising money is "an ordinary business motive, which is typically insufficient to support a strong inference of fraud."

12

246 F. App'x 780, 786 & n.10 (3d Cir. 2007) (citing *GSC Partners CDO Fund v. Washington,* 368 F.3d 228, 237 (3d Cir. 2004)).

Moreover, Plaintiffs' motive theory makes little sense as a matter of fact.  Plaintiffs claim that "Zynerba needed extensive financing to complete the clinical trials and commercialize Zygel." Pls.' Opp. Br. at 33.  In fact, Plaintiffs go so far as to suggest that Zynerba would "face bankruptcy" but for the May 2019 stock sales.  *Id*. at 33 n.25.  However, Plaintiffs do not allege any facts to support this conclusion, and Plaintiffs concede facts to the contrary.  Plaintiffs admit that, as of March 2019, Zynerba had $68.3 million in cash and cash equivalents, and expected that its cash position would take it "through [its] anticipated NDA submission and potential approval for Zygel in FXS, and into the first quarter of 2021."  Pls.' Opp. Br. at 34 (quoting Defs.' Ex. B at 8 (Dkt. 24-5)).  As a result, Plaintiffs' claim that Zynerba had an immediate need for cash is not correct.[4]

Furthermore, Plaintiffs do not allege facts showing that the Individual Defendants were aware of the BELIEVE 1 adverse events by the time of the Company's May 2019 stock sale. Indeed, as discussed above, Plaintiffs allege no facts showing when any of the adverse events arose, when the Individual Defendants became aware of them, and when the Company reached conclusions about whether the events were related to Zygel.  As it turns out, when Zynerba ultimately reported the BELIEVE 1 trial results, most of the serious adverse events experienced by patients participating in the trial were deemed ***not*** to be related to Zygel.  Defs.' Ex. M (Dkt.

---

[4]  Plaintiffs' theory about the stock sales is woefully inconsistent.  On the one hand, they say that the Company needed cash and would go bankrupt without it.  Pls.' Opp. Br. at 33 & n.25 ("Defendants do not cite a single case in which the company face bankruptcy but for a capital raise made by false statements.").   On the other hand, Plaintiffs try to distinguish cases where a company's "acute and immediate" need for cash was found to be an insufficient motive by stating that Zynerba did not actually need the money, but chose to sell at a higher price before disclosing the BELIEVE 1 trial results.  *Id.* at 35 ("Here, however, the need for cash was not acute and immediate.").  Plaintiffs' transparent attempts to maneuver around the case law makes clear that their motive theory should not stand.

24-16).  Thus, there are simply no facts to support Plaintiffs' conclusion that Zynerba was in possession of "material, adverse, non-public" information at the time of the May 2019 sale.

Finally, the facts refute any contention that Defendants withheld information because disclosure would make it difficult for the Company to raise money.  Zynerba raised money through stock sales in the months following the September 2019 disclosure of the BELIEVE 1 trial results.  Indeed, since the issuances of this purported "corrective statement," Zynerba has issued and sold 706,342 shares under a separate Controlled Equity Offering Sales Agreement, raising several million dollars in proceeds.  Defs.' Ex. E at 86 (Dkt. 24-8).

**C.      The Non-Fraudulent Explanation Is Much More Compelling Than Any Inference Of Scienter.**

Beyond all of these failings, Plaintiffs are unable to explain how the purported inference of scienter is as compelling as a non-fraudulent inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323-24 (2007); *In re Columbia Labs., Inc., Sec. Litig.*, 602 F. App'x 80, 82 (3d Cir. 2015).  As the undisputed facts make plain, Zynerba continues to believe in and pursue Zygel as a potential treatment for DEE and other rare neuro-psychiatric disorders.  Zynerba did not suspend the BELIEVE 1 trial at any point, and continued throughout (and after) the putative Class Period to invest time and money into advancing clinical trials for Zygel's use in the treatment of DEE, FXS, ASD, and 22q and pursuing FDA approval for those indications.[5]  Mot. Dismiss at 24.

---

[5]    Plaintiffs claim that the Court cannot consider Zynerba's continued investment in the development and FDA approval of Zygel after the Class Period. Pls.' Opp. Br. at 15-16.  Courts, however, routinely consider a company's continued investment in clinical studies and FDA approval in finding a non-fraudulent inference of scienter. *See, e.g.*, *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 170 (3d Cir. 2014)("[T]he initiation of Phase 3 cost millions of dollars and required FDA approval, rendering it improbable that defendants would have continued if they did not believe their interpretation of the interim results or if they thought the drug a complete failure"); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 589 (S.D.N.Y. 2016) ("[D]efendants' continued investment of time and resources into developing MoxDuo—even after receiving the

Rather than establishing an inference that the Defendants fraudulently withheld information in violation of the securities laws, the facts demonstrate that—as the Company had previously and repeatedly told the market, and consistent with Zynerba's standard practice—the Company released results only after the completion of the BELIEVE 1 trial and the information could be assessed. Further, when the Company released the BELIEVE 1 trial results in September 2019, Zynerba expressed its belief that the trial results and overall safety profile of the drug were positive. The Company continues today to invest time and resources in the development and evaluation of Zygel and in a continuing dialogue with the FDA concerning a regulatory path forward for Zygel, including for the treatment of DEE. Because the non-fraudulent explanation of Defendants' conduct is far more compelling than Plaintiffs' conclusory allegations of scienter, Plaintiffs' claims fail as a matter of law.

## II.   NO ACTIONABLE MISSTATEMENT OR OMISSION ALLEGED.

As discussed above, the Amended Complaint should be dismissed because Plaintiffs cannot meet the strict requirements for pleading scienter. However, the Amended Complaint should also be dismissed for a second, independent reason: Plaintiffs do not allege a material misstatement because they fail to allege facts establishing that Defendants had a duty to disclose the BELIEVE 1 adverse events earlier than they did.

### A.   Zynerba's Website Statements About Zygel's Potential Benefits Do Not Give Rise To A Duty To Disclose.

Plaintiffs allege that statements appearing on Zynerba's website created a duty for Defendants to disclose the adverse events earlier. Because those statements are not actionable and,

---

[letter from the FDA about deficiencies in the New Drug Application]—suggests that they honestly believed approval was still attainable."); *see also* Mot. Dismiss at 24-25 (citing additional cases).

in any event, did not put "in play" any and all information regarding the safety of Zygel, Plaintiffs are wrong.

### 1.    The Website Statements Are Puffery.

To begin, Plaintiffs misread the plain language of the website.  Contrary to Plaintiff's argument, the website does not state that use of Zygel *will* result in certain benefits.  Rather, it discusses "potential" benefits of Zygel.  Indeed, the website statement referenced by Plaintiffs appears under the heading "Potential Benefit of Zygel," and even this potential benefit focused on the "lower incidence of gastrointestinal side effects" through the use of Zygel—a transdermal gel—as compared to oral administration.  Defs.' Ex. P (Dkt. 24-19)  The website also notes that another "Potential Benefit of Zygel" is that transdermal delivery "should minimize the risk of negative psychoactive effects" as compared to oral administration.  *Id.* [6]

These website statements plainly discuss limited types of "potential" benefits arising from the fact that Zynerba is a transdermal gel and not taken orally.  As such, they are the exact type of statements that constitute mere puffery.  *See In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 284 (3d Cir. 2010); Mot. Dismiss at 30-32.  Accordingly, they are not actionable and do not give rise to a duty to disclose.

### 2.    The Website Statements Do Not Put "In Play" Any And All Information Related To The Safety of Zygel.

Even if the statements were not puffery, they do not put "in play" each and every piece of information related to the safety of Zygel, including the BELIEVE 1 trial adverse events.  Omitted

---

[6]  Plaintiffs claim that Defendants did not specifically challenge this second website statement in their opening brief and thus "concede that it is actionable."  Pls.' Opp. Br. at 12 n.8.  Defendants have conceded nothing.  Because Plaintiffs are claiming for the first time that this particular website statement created some separate duty to disclose, Defendants are entitled to respond to that argument in this Reply Brief.

information is only "in play" if it is "***sufficiently connected*** to the company's statement, such that the omission renders the statement false or misleading." *Teamsters Local 456 Pension Fund v. Universal Health Servs.*, 396 F. Supp. 3d 413, 458 (E.D. Pa. 2019) (collecting cases about what is "in play" and explaining rule that emerges from those cases).

Thus, for omitted information to be put "in play," there must be a close and direct connection between the company's statement and the information. For instance, in *Security Police & Fire Professionals of America Retirement Fund v. Pfizer, Inc.*, the plaintiffs, like Plaintiffs here, cited *Shapiro v. UJB Financial Corp.*, 964 F.2d 272 (3d Cir. 1992), and argued that a pharmaceutical company had a duty to disclose safety information regarding a Phase 2 clinical trial because its prior statements had put that information in play. No. 10-CV-3105 SDW/MCA, 2013 WL 1750010, at *6 (D.N.J. Apr. 22, 2013), *aff'd sub nom. City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159 (3d Cir. 2014). Specifically, Plaintiffs argued that the defendants had put this information in play because they had stated that the preliminary results were "encouraging" and had decided to begin Phase 3 testing before the Phase 2 trial was even completed. The court rejected that argument, explaining: "Plaintiffs' reliance on *Shapiro* for its argument that Defendants created a duty to completely disclose details regarding the Phase II interim data is misplaced. Here, Defendants did not make an affirmative statement about the Phase 2 interim data, and therefore did not put the subject of the Phase II interim data 'in play.'" *Id.* The Third Circuit affirmed, explaining that, because the company "made no affirmative statement about the strength of the Phase 2 interim results nor characterized those results in any manner," it "did not place the strength or nature of the Phase 2 interim results 'in play,' so it was under no duty to provide additional details about those results." *City of Edinburgh Council*, 754 F.3d at 174. *See also Oran v. Stafford*, 226 F.3d 275, 284 (3d Cir. 2000) (defendant pharmaceutical

17

company's repeated statements that FDA approved drug and found it be to safe did not put "in play" the entire FDA approval process, including that the FDA had not been told about 31 adverse events); *Hirtenstein v. Cempra, Inc.*, 348 F. Supp. 3d 530, 557-58 (M.D.N.C. 2018), *aff'd sub nom. Janies v. Cempra, Inc.*, No. 18-2415, 2020 WL 2770554 (4th Cir. May 28, 2020) ("Plaintiffs have a stronger argument that Fernandes had a duty to disclose the adverse events in the COPD trial when discussing the overall safety profile of the drug . . . . Nevertheless, the disclosure of the adverse events was not required in this instance where Fernandes did not mention the COPD Phase 2 trials directly, limited her discussion to the clinical data as a whole, and made vague statements of opinion regarding the data.").[7]

Here, Zynerba did not put "in play" any and all safety information, including the adverse events that arose during the BELIEVE 1 trial. Zynerba did not publicly disclose interim safety results from the BELIEVE 1 trial or state that Zygel was "safe" for DEE patients. Moreover, the website statements upon which Plaintiffs rely have nothing to do with the BELIEVE 1 trial. Rather, those statements merely note that there are potential benefits from transdermal application,

---

[7] Likewise, Plaintiffs cannot show that the adverse events rendered the website statements false or misleading. *See Howard v. Arconic Inc.*, 395 F. Supp. 3d 516, 547 (W.D. Pa. 2019) (company's general statements about values, workplace safety, ethics, and the like not rendered false by alleged unsafe end use of one of its products.); *In re Heartland Payment Sys., Inc., Sec. Litig.*, No. 09-1043, 2009 WL 4798148, at *6 (D.N.J. Dec. 7, 2009) (company's disclosures concerning data security system not rendered false by specific security breach). As an initial matter, the BELIEVE 1 trial did not compare the gastrointestinal side effects of Zygel to those associated with an orally administered drug. Moreover, when Zynerba released the "top-line results" from the trial in September 2019, it reported that the most common types of treatment-related adverse events were application site dryness, application site pain, and somnolence—all conditions which have nothing to do with gastrointestinal or psychoactive (change in mental state) side effects. *See* Defs.' Ex. M at 2 (Dkt. 24-16). Of the reported serious adverse events, most were infection-related, and only two, a lower respiratory tract infection and status epilepticus, were determined to be possibly related to treatment—again, nothing to do gastrointestinal or psychoactive side effects. *Id.*

18

as opposed to oral administration. As such, the Defendants did not have a duty to disclose the BELIEVE 1 adverse events earlier.

Beyond lacking support in the law, Plaintiffs' argument, if accepted, would lead to unworkable results. If Plaintiffs' argument were correct, then Zynerba's website statement—which discussed potential benefits arising from transdermal application rather than oral administration—would give rise to a duty to disclose in real time each and every adverse event from each and every clinical trial that the Company ever conducts with respect to Zygel. *See* Pls.' Opp. Br. at 11 n. 7 (arguing that the website gave rise to duty to disclose all adverse events, whether related to the website statements or not). The same could be said for every company that advertises potential benefits from a drug product. Such a result would not only be unfeasible, but it would discourage drug companies from ever saying anything about the potential benefits of drugs under development. Because Plaintiffs' argument is legally unsupported and sweeps far too broadly, it should be rejected.

### B. Zynerba's Statements Concerning The Phase 1 Results Do Not Give Rise To A Duty To Disclose.

Plaintiffs next argue that Zynerba's statements that the Phase 1 trial results demonstrated that Zygel was "safe and well-tolerated" gives rise to a duty to disclose adverse events during the Phase 2 trial. Pls.' Opp. Br. at 8. However, Phase 1 trials *always* involve an assessment of the drug's safety profile, and a sponsor proceeds to a Phase 2 trial only if Phase 1 trial results support the drug's safety. Mot. Dismiss 5-6. Accordingly, Plaintiffs' argument amounts to a contention that anytime a sponsor reports on positive Phase 1 results, it automatically has a duty to disclose all adverse events in a Phase 2 trial, as they occur. Unsurprisingly, Plaintiffs cite no cases for this proposition. This is because the case law provides otherwise. *Gregory v. ProNAi Therapeutics Inc.*, 297 F. Supp. 3d 372, 401 (S.D.N.Y. 2018), *aff'd*, 757 F. App'x 35 (2d Cir. 2018) ("No

19

reasonable investor would interpret [company's] statements during [earlier trials] as addressing, let alone making representations about, the outcomes of the [ongoing] trials," especially where [the company] had cautioned, including at the start of the Class Period, that "[t]he outcome of ... early clinical trials may not be predictive of the success of later clinical trials."); *see also* Ex. A, 2018 Form 10-K at 45 (Dkt. 24-4) (warning that "[b]ecause the results of preclinical studies and earlier clinical trial are not necessarily predictive of future results, Zygel may not have favorable results in our planned clinical trials").

### C.    Zynerba's Cautionary Statements Do Not Give Rise To A Duty To Disclose.

Although Plaintiffs dismiss Zynerba's risk disclosures in their Amended Complaint as "generic" and "boilerplate," Am. Compl. ¶ 31; Mot. Dismiss at 22, Plaintiffs now claim that the cautionary statements themselves created a duty to disclose.  Plaintiffs specifically claim that Zynerba's statement that *"because the results of preclinical studies and earlier clinical trials are not necessarily predictive of future results, Zygel may not have favorable results in our planned clinical trials"* is misleading, because Defendants already knew when the cautionary statement was issued that patients in the BELIEVE 1 trial suffered "unfavorable safety results."  Pls.' Opp. Br. at 13.  This argument fails for several reasons.

First, the argument should be rejected because there is no allegation that the adverse events had occurred by the time Zynerba issued this risk disclosure in its 2018 Form 10-K, which was filed on March 11, 2019.  *See* Am. Compl. ¶¶ 29, 31.  The BELIEVE 1 trial was not completed until the third quarter of 2019.  There are no allegations that the adverse events had occurred prior to the issuance of the Form 10-K.

Moreover, the risk disclosure was and is not false.  The risk disclosure, read fairly, simply means that favorable earlier trials does not mean that later clinical trials will be favorable.  There is nothing false or misleading about that statement.

20

Finally, the case upon which Plaintiffs primarily rely, *Williams v. Globus Med., Inc.*, 869 F.3d 235 (3d Cir. 2017), does not support their argument.  In *Williams*, the company warned that "if any of our independent distributors were to cease to do business with us, our sales could be adversely affected."  *Id.* at 242.  The plaintiffs claimed that this statement became false once the company failed to disclose that it had terminated its relationship with an independent distributor. *Id.*  The Third Circuit rejected this argument, finding that the risk disclosure related to lost sales— not to the loss of independent distributors.  *Id.*  Accordingly, because the plaintiffs had not pleaded that the company's sales were adversely affected by the decision to terminate the distributor, the company had no duty to say more.  *Id.* at 243.

Here, as discussed above, Plaintiffs fail to adequately plead that the Defendants actually knew of the adverse events in the BELIEVE 1 trial when the Company issued its 10-K (or at any point during the Class Period).  But even if Defendants had known before the 10-K was issued that some number of patients experienced an adverse event, the cautionary statement still would not be false.  As the Supreme Court has noted, "[a]dverse event reports are daily events in the pharmaceutical industry."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43 (2011).  Thus, the mere presence of some adverse events does not render the ***overall results of the trial*** unfavorable.  In fact, upon the BELIEVE 1 trial's conclusion, Zynerba assessed the results as positive, finding that Zygel is well-tolerated overall and that the results warranted continued

pursuit of FDA approval for the treatment of DEE.[8]   Thus, the risk disclosures identified by

Plaintiffs were in no way misleading or inaccurate.[9]

### D.    There Is No Generalized Duty To Update Applicable Here.

Having failed to demonstrate that Defendants had a duty to disclose earlier the BELIEVE

1 adverse events based on Zynerba's past statements about Zygel, Plaintiffs argue that Zynerba

had some generalized duty to update its prior statements.  Pls.' Opp. Br. at 13-14.  Once again,

Plaintiffs' argument fails

As an initial matter, Plaintiffs do not identify the statement that they believe needs to be

updated.  The closest Plaintiffs come is to claim that the Company had a "duty to update their prior

statements regarding Zygel's safety."  Pls.' Opp. Br. at 13-14.  As discussed above, the only

specific statements to which Plaintiffs point—the website statements, the disclosures regarding the

Phase1 results, and the Form 10-K risk disclosure—were not misleading and did not give rise to a

duty to disclose more.  Plaintiff should not be able to assert a claim without specifically identifying

the statement that purportedly should have been updated.

---

[8]   Plaintiffs note that these kinds of cautionary warnings are "common to all pharmaceutical companies with drugs under development for FDA approval." Am. Compl. ¶ 30; Pls.' Opp. Br at 22, As such, Plaintiffs' argument, if accepted, would require Zynerba and every other pharmaceutical company that makes similar cautionary statements to disclose each and every adverse event that occurs during a clinical trial.  Plaintiffs have cited no case law to support this result, which would be incredibly burdensome to pharmaceutical companies and flood investors with information about adverse events during the various phases of clinical trials.

[9]   Plaintiffs also claim that Zynerba's risk disclosures that "failures or delays in our clinical trials of Zygel could result in increased costs" and "regulatory approval processes of the FDA . . . are . . . inherently unpredictable" were also false and misleading because those risks had already materialized. Pls.' Opp. Br. at 22.  This claim makes no sense.  Plaintiffs plead no facts—let alone particularized facts—about a delay in clinical trials, increased costs to Zynerba for obtaining FDA approval, or any issues with obtaining FDA approval for Zygel, either for the treatment of DEE or any other condition.  There is nothing false about these risk disclosures, and this meaningful cautionary language entitles Defendants to protection under the PSLRA's Safe Harbor provision. *See* Mot. Dismiss at 32-33

In any event, no duty to disclose would arise in these circumstances. Under Third Circuit law, a duty to update arises when "statements that, although reasonable at the time made, become misleading when viewed in the context of subsequent events." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1431 (3d Cir. 1997). To require update, the initial statement must contain "an implicit factual representation that remained 'alive' in the minds of investors as a continuing representation." *Id.* at 1432. Because of the potential to create a sweeping continuing obligation for corporations when they disclose information, the Third Circuit has limited the duty to update to "*narrow circumstances*" involving "*fundamental corporate changes* such as mergers, takeovers, or liquidations," as well as when subsequent events produce an "*extreme*" or "radical change" in the continuing validity of the original statement. *See City of Edinburgh Council*, 754 F.3d at 176 (emphasis added); *United States v. Schiff*, 602 F.3d 152, 170 (3d Cir. 2010).

Those circumstances are clearly not present here. Zynerba has not experienced a fundamental corporate change. Nor has there been an extreme or radical change in the Company's prior statements. The website statements, statements regarding the Phase 1 trial, and the Form 10-K risk disclosures were and are accurate. Moreover, Plaintiffs' claims concern a single clinical trial which turned out to be positive overall, not some event that made it impossible for Zygel ever to be approved by the FDA or commercialized.[10] As such, there was no radical change and no duty to update.

### E.    Plaintiffs' Other Arguments Are Unsupported By Third Circuit Law.

Finally, Plaintiffs claim that Defendants had a duty to disclose based on Item 303 of Regulation S-K and Zynerba's stock sales under the Jefferies Open Market Sales Agreement. Once again, Plaintiff's arguments are contrary to Third Circuit law.

---

[10] In the hopes of strengthening their argument, Plaintiffs claim that Zynerba's previous trials had no serious adverse events. Pls.' Opp. Br. at 15. Plaintiffs are wrong. In August 2017, Zynerba

Item 303 requires a public company to affirmatively disclose, *inter alia*, trends or uncertainties that are (1) presently known to management; and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation.    17 C.F.R. § 229.303(a)(3)(H).    Item 303 is enforced by the SEC through enforcement actions.    *See Interpretation: Commission Guidance Regarding Management's Discussion and Analysis of Financial Condition and Results of Operations*, SEC, 17 C.F.R. §§ 211, 231, 241 (Dec. 19, 2003), *available at* www.sec.gov/rules/interp/33-8350.htm#P18_1728.  The Third Circuit held squarely in *Oran* that there is no independent private right of action under Item 303.  226 F.3d at 285-86; *see also In re Galena Biopharma, Inc. Sec. Litig.*, 336 F. Supp. 3d 378, 391 (D.N.J. 2018) (same). The Third Circuit also held that a violation of Item 303 can be actionable under the federal securities laws only when "a duty to disclose [is] separately shown."  *Oran*, 226 F.3d at 288.  As discussed above, Plaintiff fail to allege facts giving rise to such a duty.  Accordingly, their reliance on Item 303 adds nothing to their arguments.

Plaintiffs next claim that Defendants were under a duty to disclose by virtue of the "abstain or disclose" rule, which requires insiders to disclose information on which they plan to act before they trade upon it.  However, an insider's duty to disclose information under the narrow "abstain or disclose" rule is not transferrable to general securities fraud claims, such as an omission claim brought under Section 10(b).  *In re Safeguard Scis.*, No. CIV.A.01-3208, 2004 WL 2700291, at *3 (E.D. Pa. Nov. 18, 2004) (collecting cases); *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 403 (6th Cir. 1997) (the "abstain or disclose" rule does not apply to securities fraud claims that do not contain explicit insider trading claims); *Anderson v. Abbott Labs.*, 140 F.

---

reported serious adverse events, including treatment-related adverse events, when it reported the top-line results for its Phase 2 STOP trial.  Defs.' Ex. H (Dkt. 24-11).

24

Supp. 2d 894, 909-10 (N.D. Ill. 2001) ("[T]his is not an insider trading case"), *aff'd sub nom.*

*Gallagher v. Abbott Labs.*, 269 F.3d 806 (7th Cir. 2001).  Plaintiffs do not cite binding authority

to the contrary.  As Plaintiffs have not brought insider trading claims against Defendants, they

may not rely on the "abstain or disclose" rule to impose a duty of disclosure here.[11]

### CONCLUSION

For the reasons set forth herein, as well as in Defendants' opening brief, the Court should

dismiss the Amended Complaint with prejudice.

Dated:  July 10, 2020                                      Respectfully submitted,

                                                          */s/ David H. Kistenbroker*
                                                          David H. Kistenbroker (admitted *pro hac vice*)
                                                          DECHERT LLP
                                                          35 West Wacker Drive, Suite 3400
                                                          Chicago, IL 60601-1608
                                                          Telephone: 312-646-5800
                                                          Facsimile: 312-646-5858
                                                          david.kistenbroker@dechert.com

                                                          Michael S. Doluisio (Pa. 75060)
                                                          Tiffany Engsell (Pa. 320711)
                                                          DECHERT LLP
                                                          Cira Centre, 2929 Arch Street
                                                          Philadelphia, PA 19104
                                                          Telephone:  215-994-4000
                                                          Facsimile: 215-994-2222
                                                          michael.doluisio@dechert.com
                                                          tiffany.engsell@dechert.com

                                                          *Attorneys for Defendants*

---

[11]  Even if Zynerba's stock sales under the Jefferies Open Market Sales Agreement gave rise to some duty to disclose, Plaintiffs have not adequately pleaded that the adverse events occurring during the BELIEVE 1 trial were "material information," such that Zynerba was required to disclose it. *Chiarella v. United States,* 445 U.S. 222, 227 (1980).  As noted above, Plaintiffs have alleged no facts showing that the Defendants learned of the adverse events in the BELIEVE 1 trial by the time of the sales, concluded the events were treatment-related, or made any assessment of the impact of the adverse events reported during the BELIEVE 1 trial on Zygel's overall safety profile or ability to achieve FDA approval.  Moreover, Plaintiffs' insider trading allegations are insufficient because they do not plead facts meeting the heightened pleading standards for scienter under the PSLRA.  *See City of Edinburgh Council*, 754 F.3d at 175-76.

25